COMMONWEALTH *vs.* JAMES F. BLAIKIE, JR.

Norfolk. November 8, 1977. — July 6, 1978.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Evidence,* Relevancy and materiality, Judicial discretion. *Practice, Criminal,* Mistrial, Discovery, Disclosure of statements by defendant, Argument by prosecutor. *Witness,* Prosecutor as witness, Expert witness.

Evidence at a murder trial was sufficient to warrant a finding that the defendant acted with deliberate premeditation in killing the victim. [605-606]

Where a criminal trial ended in a mistrial after a police officer testified as to statements made by the defendant which the prosecution had unintentionally failed to disclose as required by a pretrial discovery

---

agreement, the award of a new trial, accompanied by pretrial disclosure of all the defendant's statements, remedied the effect of the prejudicial testimony at the first trial, and the prosecution was not limited at the second trial to only those statements disclosed prior to the first trial. [606-608]

At a criminal trial, there was no error in the judge's refusal to allow defense counsel to call the prosecutor as a witness for the purpose of impeaching the testimony of two police officers where there was no showing that the prosecutor's testimony would be relevant, material, and not cumulative. [608-610]

The judge at a murder trial did not err in refusing to permit the defense to reopen its case for the second time in order to present expert witnesses on the sole issue of rigor mortis where the witnesses had no personal knowledge of the condition of the victim's body. [610-611]

The judge at a murder trial did not err in failing to instruct the jury that the prosecutor in her closing argument improperly suggested the existence of a large loan as the motive for the killing where the suggestion could be reasonably inferred from the evidence, the defendant did not request a specific curative instruction, and the judge instructed the jury that such arguments are not to be considered as evidence. [611-613]

INDICTMENT found and returned in the Superior Court on January 26, 1976.

The case was tried before *McGuire,* J.

*Daniel G. Harrington* (*Paul F. Markham* with him) for the defendant.

*Alice E. Richmond,* Special Assistant Attorney General (*Charles J. Hely,* Assistant District Attorney, with her) for the Commonwealth.

LIACOS, J. The defendant appeals under the provisions of G. L. c. 278, §§ 33A-33G, from a conviction of murder in the first degree. The defendant argues on appeal that the trial judge erred in (1) denying the defendant's motion for a directed verdict of not guilty on so much of the indictment as charged murder in the first degree; (2) denying the defendant's motion to suppress statements, based on an alleged breach of a discovery agreement; (3) refusing to allow the defendant to call the prosecutor as a witness; (4) denying the defendant permission to reopen his case on surrebuttal; and (5) failing to instruct the jury that the prosecutor's clos-

ing argument contained statements of fact not based on the evidence.

We conclude that there was no error. After reviewing the case on the law and the evidence, we also conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E. We briefly summarize the evidence presented at trial by the prosecution before turning to the defendant's assignments of error.

The arrest of the defendant followed the discovery in November, 1975, of the corpse of twenty-seven year old Caesar D. DeWilde. The police found the deceased buried in a dry well located in the basement of a house in Brookline, owned and occupied by the defendant from April of 1974 to April of 1975. To reach the body, the police had to break through a layer of concrete, then two to three inches of coal and an eighteen-inch layer of sand. Beneath three large green plastic garbage bags lay the body of DeWilde in a curled-up position. His head was encased in a bloodied plastic bag, bound around his neck with a wire and string; the back portion of his body was covered with an "egg shell" thin layer of concrete lime. This layer remarkably retarded the normal decomposition process, well preserving the body for identification purposes. The autopsy revealed that DeWilde had been shot once in the back of the head with a .38 caliber bullet. Dr. Bigelow, the medical examiner, testified that DeWilde had been dead for at least six months prior to the discovery of the corpse by the police.

It was in January of 1975 that the police had begun their search for DeWilde. Responding to a report by DeWilde's mother that her son was missing, the police sought information as to DeWilde's whereabouts from the defendant. The defendant had known DeWilde for several years. DeWilde was impressed by Blaikie's apparent financial success as evidenced by his large home in Brookline, his new cars, and his sailboat. In reality, the defendant was living beyond his means, for he was deeply in debt. In early December, 1974, the defendant had borrowed $6,000 from DeWilde to be repaid on February 12, 1975. There also was evidence, of-

fered to show the state of mind of the deceased, that a week before his death DeWilde loaned the defendant an additional large sum of money. According to his friends, DeWilde was thus "uptight" and worried that he would "lose everything."

On January 14, 1975, DeWilde, owner of a foreign auto repair business, was playing "nickel" poker during his lunch break with Matthew Chaet, who rented garage space to DeWilde. At approximately quarter past twelve, DeWilde received a telephone call. Elated by the telephone message, DeWilde slapped Chaet on the back and yelled, "He's got it. Jimmy's got it." About five minutes later the telephone rang again, and Chaet heard DeWilde say after taking the receiver, "Oh, you want me to come over there? Okay." Shortly thereafter DeWilde left the garage and never returned.

In response to police questioning in January, the defendant told them that DeWilde arrived at his home in Brookline around noontime on January 14 to deliver certain automobile insurance papers and to collect on a $50 Superbowl bet. The defendant volunteered false and misleading information, which he later admitted was an attempt to steer the police investigation away from him.

On February 6 and 25, 1975, police Officers Doris and Moran interviewed the defendant. Without recounting the details of these February meetings, it is sufficient to note that the defendant made various incriminating statements. He admitted that he had previously lied to the police and that he owed DeWilde $6,000. He also told them he was involved as a middleman in a deal between DeWilde and a man named Ned Woodman. Subsequently, the defendant sold his house and went to Phoenix, Arizona.

The defendant testified in his own defense. He admitted killing DeWilde but claimed he did so in self-defense. The defendant portrayed DeWilde as a hot-tempered loan shark who wanted to collect on the $6,000 loan a month before it became due. When the defendant could not produce the entire amount of the loan, DeWilde became enraged and

threatened him. In the ensuing scuffle, the defendant shot DeWilde in the head.

1. *Deliberate premeditation.* At the close of the Commonwealth's case in chief, the defendant moved for a directed verdict of not guilty of murder in the first degree. The defendant claims error in the judge's denial of this motion. The narrow issue raised by the defendant's motion for a directed verdict is whether the evidence, in its light most favorable to the Commonwealth, was sufficient to permit the jury to infer deliberate premeditation. *Commonwealth v. McInerney*, 373 Mass. 136, 153 (1977). In considering this issue, we review only the evidence introduced during the Commonwealth's case in chief. *Commonwealth v. Kelley*, 370 Mass. 147, 149-150 (1976).

To prove deliberate premeditation, an essential element of murder in the first degree, the Commonwealth must show that the defendant's resolution to kill was a product of cool reflection. "[W]here the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought." *Commonwealth v. Tucker*, 189 Mass. 457, 494 (1905). See also *Commonwealth v. Caine*, 366 Mass. 366, 374 (1974); *Commonwealth v. Brooks*, 308 Mass. 367, 369 (1941).

We conclude that there was sufficient evidence from which the jury could infer that the defendant deliberately premeditated the act. In reaching this conclusion, we need not consider conduct of the defendant after the killing in an attempt to avoid detection. Such conduct is rarely relevant to the issue of premeditation. See W.R. LaFave & A.W. Scott, Jr., Criminal Law § 73, at 565 (1972). See also *People v. Anderson*, 70 Cal. 2d 15, 33-34 (1968). Thus, the defendant's elaborate concealment of the body without proof that preparations were made in advance of the killing, his misleading and false statements to the police officers, and his subsequent flight to Phoenix are more properly considered as evidence of consciousness of guilt, not premeditation. See

*Commonwealth* v. *Noxon*, 319 Mass. 495, 533 (1946). Cf. *Commonwealth* v. *Smith*, 350 Mass. 600, 606-607 (1966).

The evidence previously recited, apart from the matters excluded above, was ample to warrant the finding of the jury. The jury could have found that the defendant had a motive to kill in that he was being pressed for repayment by DeWilde, his creditor, and that he lured him to his home with a preconceived plan to kill. The evidence of a single deadly shot in the back of the victim's skull adds further weight to such a finding. There was no error in the denial of the motion for a directed verdict.

2. *Motion to suppress.* Prior to the second trial, the judge denied the defense motion to suppress incriminating statements of the defendant that were not disclosed to the defendant prior to his first trial on this indictment. These statements, made to the police while DeWilde was still considered a missing person, included admissions by the defendant that he had a motive to kill DeWilde and that he had lied to avoid being suspected of killing DeWilde.

The first trial ended in a mistrial after police Officer Moran testified that on February 25, 1975, the defendant had told him that "[h]e didn't want to be suspected of killing David DeWilde." Finding this testimony to be so different from the language in any pretrial information disclosed to the defendant as to be prejudicial, the judge granted the defendant's motion for a mistrial. The judge found neither the prosecutor nor the defense counsel blameworthy, but attributed the discrepancy between Moran's trial testimony and his previously disclosed interview notes to a "difference in understanding of the language used" and a failure to have the defendant's discovery motions "formally acted on by the Court in precise language."[1]

---

[1] At a suppression hearing held prior to the second trial, Moran described it as "stupid" on his part for testifying to a statement not previously delivered to the defense. According to Moran, the prosecutor had carefully instructed him to limit his trial testimony to the statements in his own notes and pretrial testimony because those were the oral statements of the defendant that had been reduced to writing and disclosed to the defense.

The defendant argues on appeal that because the prosecutor at the aborted first trial allegedly breached a pretrial discovery agreement to disclose all the defendant's statements, due process requires that the prosecution be limited at the second trial to only those statements disclosed prior to the first trial.[2]

The defendant here was fully apprised of the contents of his statements that would be used against him at the second trial. More than a month before that trial, the prosecution delivered to the defense counsel all the defendant's statements. In doing so, the prosecution complied with the discovery rule set forth in *Commonwealth* v. *Lewinski*, 367 Mass. 889, 903 (1975) ("Written statements and the substance of any oral statements of a defendant, available to the prosecution, shall be delivered as matter of course to counsel for that defendant . . ."). The defendant contends, however, that more is required. To punish the Commonwealth for the misconduct at the first trial, the defendant argues he was entitled not only to a new trial, but also to the exclusion from that trial of incriminating statements not produced prior to the first trial.

The award of a new trial, accompanied with pretrial disclosure of all the defendant's statements, remedied the effect of the prejudicial testimony at the first trial. None of the cases relied on by the defendant precludes the prosecution from using additional statements by the defendant which were not produced prior to an aborted first trial. Indeed, in *United States* v. *Padrone*, 406 F.2d 560, 561 (2d Cir. 1969), cited by the defendant, the Second Circuit explicitly approved of the mistrial procedure used here and ordered a new trial, to be preceded by the government's

---

[2] The defendant also moved before the judge below for suppression on the grounds that the police obtained these statements in violation of his Fifth and Sixth Amendment rights and that it was "unbelievable that said statements are the result of the present recollection of the police." The defendant did not present these arguments on appeal, and we treat them as waived. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). See *Commonwealth* v. *Lovett*, 374 Mass. 394, 403 (1978).

disclosure of all statements. See also *United States* v. *Lewis*, 511 F.2d 798, 803 (D.C. Cir. 1975). We believe that the judge here applied an appropriate remedy for the unintentional nonproduction at the first trial of all the defendant's statements.

3. *The prosecutor as a witness*. Failing to obtain the suppression of these incriminating statements, the defendant sought to attack the credibility of the officers who testified to these statements. The defendant filed prior to the second trial a "Notice of Intent" to call the prosecutor as an impeachment witness. The judge treated this notice as a request to allow the defense to call the prosecutor. After hearing argument from counsel and giving the defense the opportunity to make an offer of proof, the judge denied the request.

We reject the defendant's claim that the judge's ruling violated his rights to compulsory process and to present witnesses in his own defense as guaranteed by the Sixth Amendment of the United States Constitution and art. 12 of the Declaration of Rights of the Constitution of the Commonwealth.[3]

As the defendant admits, the accused's right to present witnesses in his own behalf is not absolute. See *United States* v. *Nobles*, 422 U.S. 225, 241 (1975) (trial judge may control scope of examination of witnesses); *Hamling* v. *United States*, 418 U.S. 87, 127 (1974) (trial judge may refuse to allow cumulative, repetitive, or confusing evidence). When the defendant resorts to the extraordinary means of calling

---

[3] The Sixth Amendment's compulsory process clause, applicable to the States through the due process clause of the Fourteenth Amendment, governs not only the right to secure the presence of defense witnesses but also the defendant's right to have the testimony of these witnesses entered in evidence. *Washington* v. *Texas*, 388 U.S. 14, 23 (1967). General Laws c. 277, § 66, relied on by the defendant, is not relevant here since it governs only the process to summon witnesses necessary to the defense. However, art. 12 is pertinent as it explicitly guarantees the right to present a defense: "[E]very subject shall have a right to produce all proofs, that may be favorable to him . . . ." See *Commonwealth* v. *Mangan*, 293 Mass. 531, 533 (1936). See also G. L. c. 263, § 5.

the prosecutor as a witness, we believe that his defense will not be jeopardized if he must make a satisfactory offer of proof as to the need for the prosecutor's testimony. Cf. *Gajewski* v. *United States*, 321 F.2d 261, 268 (8th Cir. 1963), cert. denied, 375 U.S. 968 (1964); *United States* v. *Maloney*, 241 F. Supp. 49, 50 (W.D. Pa. 1965). Cf. *Kendall* v. *Atkins*, 374 Mass. 320 (1978). The defendant here failed to show that the prosecutor had personal knowledge of relevant factors bearing on the credibility of the police officers that could not be elicited by other means.

It was the contention of the defense that the prosecutor's averment to the judge at the first trial that "there are no other statements" would be critical in attacking the credibility of Officers Moran and Doris who testified to additional incriminating statements by the defendant at the second trial. According to the defense theory these officers fabricated the defendant's statements in order to supply evidence that the defendant had a motive for the crime.

Officer Moran testified at the first and second trials that he remembered incriminatory statements made by the defendant on February 6 and 25, 1975, that were not fully recorded in his own notes. Officer Doris, who had not been called as a witness at the first trial, testified at the second trial that he heard and recorded in his own notes incriminatory statements made by the defendant on February 6 and 25. In cross-examination of the officers, the incompleteness of Moran's notes and the subsequent disclosure of Doris's notes were repeatedly brought to the jury's attention. Both officers testified that Officer Doris made more detailed notes which were not delivered to the prosecutor until sometime after the first trial began.

In light of these explanations by the police officers, the expected testimony of the prosecutor would have no impeachment value. See *Fisher* v. *United States*, 231 F.2d 99, 104 (9th Cir. 1956). At no time did the defense allege that the prosecutor was present during either the February 6 or February 25 interview and could testify whether the incriminating statements were in fact made. In the absence of an ad-

vance showing to the judge that the prosecutor's testimony would be relevant, material, and not cumulative, we find no constitutional error. Cf. *Hayes* v. *United States*, 329 F.2d 209, 219 (8th Cir.), cert. denied sub nom. *Bennett* v. *United States*, 377 U.S. 980 (1964).

4. *Rebuttal witnesses.* We also find that no violation of the defendant's constitutional right to present witnesses in his own defense was caused by the judge's refusal to allow the defendant to call two expert witnesses in surrebuttal.

After the defense rested its case, the prosecutor called in rebuttal Dr. Bigelow, the medical examiner who had personally examined the victim's body. Dr. Bigelow's testimony included the opinion that due to rigor mortis, it would have been "virtually impossible" for the defendant to have placed the victim's stiff body in the dry well more than eight hours after death, as the defendant had testified he had done. In his cross-examination, the defendant's counsel did not question the doctor on this point.

The judge then permitted the defendant to reopen his case and take the stand again. After brief testimony by the defendant on a question unrelated to the rigor mortis issue, the defense rested its case for a second time. The judge announced this to the jury and informed them that closing arguments would begin the following morning. The next morning the defense moved to reopen its case to present the testimony of an embalmer and a medical examiner on the sole issue of rigor mortis. The motion was denied, and counsel proceeded with their closing arguments.

As we have explained in part 3, the constitutional right of the accused to call witnesses is not without limit. Although a defendant should be given the opportunity to counter the effect of the prosecution's expert testimony with experts of his own,[4] we find no prejudice here. The defendant had al-

---

[4] It is true that the testimony of Dr. Bigelow became of special importance when the prosecutor relied on it in her closing argument. She argued that the body had been immediately buried after death, thus inferring that the use of the dry well as a grave had been planned well in advance. However, in the defendant's summation, counsel pointed out that even if

ready given his version of the circumstances of the burial. Cf. *Commonwealth* v. *Arsenault*, 361 Mass. 287, 299 (1972) (evidence excluded merely corroborated defendant's testimony). More importantly, the experts the defendant hoped to present had no personal knowledge of the condition of the victim's body.

Cases which the defendant cites to support his contention that his constitutional right to establish a defense was violated involve trials where the judge excluded the testimony of witnesses with personal knowledge of issues before the jury. *Chambers* v. *Mississippi*, 410 U.S. 284, 294 (1973) (person to whom oral confessions of the murder had been made). *Washington* v. *Texas*, 388 U.S. 14 (1967) (accomplice's testimony). *Johnson* v. *Johnson*, 375 F. Supp. 872, 876 (W.D. Mich. 1974) (crucial alibi witness). The judge here refused to permit the defense to reopen its case for the second time in order to present expert witnesses who had no direct personal knowledge; this refusal does not violate the defendant's constitutional right. See *Commonwealth* v. *Vitello*, 367 Mass. 224, 235 (1975); *Commonwealth* v. *French*, 357 Mass. 356, 402-403 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972).

5. *Closing argument.* Finally, the defendant assigns as error the judge's failure to instruct the jury that the prosecutor in her closing argument improperly suggested the existence of a large loan as the motive for killing DeWilde.[5]

---

the body were in rigor mortis eight hours after death, the time when the defendant claimed to have buried it, the prosecution presented no evidence that the victim's body was in a stretched out position, unable to fit into the dry well.

[5] The prosecutor made the following remarks to the jury: "Now, in addition to motive, and I suggest that $6,000 loan, DeWilde was not worried about that $6,000 at all. Something happened, ladies and gentlemen. Something happened in that bank on January 10, 1975, when this man [the defendant] went to that bank with David DeWilde." When the prosecutor then argued that on Friday, January 10, DeWilde gave the defendant money, the defendant's counsel objected and noted his exception on the ground that there was no evidence to support this statement. The pros-

In their summations to the jury, counsel may argue inferences from the evidence which are most favorable to his or her theory of the case, as long as the inferences drawn are reasonable. See *Commonwealth* v. *Cheek*, 374 Mass. 613, 618-619 (1978); *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977); *Commonwealth* v. *Baptiste*, 372 Mass. 700, 713 (1977). The prosecutor here did not overstep the bounds of permissible argument.

At the trial, the Commonwealth introduced sufficient evidence from which the jury could reasonably infer that the defendant borrowed a large sum of money from DeWilde several days before the murder, and that this loan provided the motive for the killing. Through the testimony of several friends of the victim, offered to prove his state of mind, evidence was presented that DeWilde told his friends of a loan he had made to the defendant the previous week which was due on Sunday, January 12, 1975, but had not been repaid. The jury heard testimony that on Friday, January 10, 1975, and continuing until Tuesday afternoon when he received a telephone call from the defendant, DeWilde was "uptight" and worried that he had "lost everything." A bank officer at the Norfolk County Trust Company testified that on January 10, 1975, DeWilde, who had always come alone to the safe deposit area, brought a visitor this time to the vault. Until confronted by the police with evidence of his presence at the bank, the defendant repeatedly denied that he had accompanied DeWilde to the bank on January 10.

Given the foregoing, it reasonably could be inferred from the evidence that the defendant, under increasing financial pressure, asked DeWilde for more money on January 10. DeWilde's statement that he had "lost everything" and the defendant's evasiveness about going to the safe deposit box

---

ecutor then continued: "That is what it was all about. That is why DeWilde was so nervous, thought he would lose everything. That is what the phone calls were about. That is what Jimmy was all about, not about the $6,000, but something happened in that bank on that Friday."

with DeWilde indicate that a large financial transaction could have occurred.[6]

Even if the prosecutor's remarks on the existence of a loan as motive may have bordered on speculation, the defendant did not ask for a specific curative instruction, and the judge put the closing argument in its proper perspective by instructing the jury that such arguments are not to be considered as evidence. Compare *Commonwealth* v. *Stone*, 366 Mass. 506, 515 (1974), *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 313 (1973), and *Commonwealth* v. *Martin*, 357 Mass. 190, 193 (1970), with *Commonwealth* v. *Shelley*, 374 Mass. 466, 471 (1978), *Commonwealth* v. *Burke*, 373 Mass. 569, 576 (1977), and *Commonwealth* v. *Redmond*, 370 Mass. 591, 596-597 (1976).

6. *Chapter 278, § 33E, review.* After carefully examining the record, we decline to revise the jury verdict of guilty of murder in the first degree.

*Judgment affirmed.*

---

[6] Testimony establishing the amount of this loan was conflicting, varying from $6,000 to $15,000.