COMMONWEALTH *vs.* EDWARD PALMARIELLO
(and a companion case[1]).

Suffolk.   December 7, 1983. — June 1, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Argument by prosecutor, Newspaper article, Fair trial, Instructions to jury. *Evidence,* Relevancy and materiality, Hearsay, Other offense.

Certain statements made by the prosecutor in a murder case during his closing argument were permissible as inferences of fact from the evidence and were not, as claimed by the defendant, misstatements of the evidence. [132-133]

At the trial of a murder case, no substantial risk of a miscarriage of justice was created by the prosecutor's inaccurate account during closing argument of a statement made by the defendant, where the prosecutor's version of the defendant's statement could be inferred from the evidence and where the judge instructed the jury that remarks made by counsel are not evidence. [133]

At the trial of indictments charging a son and his friend with the murder of the son's mother, the prosecutor's statements in closing argument, that if the son did not intend his mother to die he would have done something to stop his friend from killing her and that the son had a moral obligation to help his mother, were not improper. [133-134]

At the trial of a murder case the prosecutor's improper reference in his closing argument to the consequences of the jury's decision did not create a substantial risk of a miscarriage of justice in view of the judge's curative instructions. [134-135]

Although certain remarks made by the prosecutor in a murder case during closing argument in which he referred to the rights of the victim came close to an improper appeal to sympathy, they did not create a substantial risk of a miscarriage of justice in view of the prosecutor's subsequent statement respecting justice for the defendants and the judge's instructions that the jury decide the case on the evidence. [135]

---

[1] Commonwealth *vs.* Bruce Chambers.

At the trial of a defendant charged with the murder of his mother, the prosecutor's references during closing argument to the mother-son relationship and his statements respecting the deterioration of the victim's body in the woods did not, in the circumstances, create a substantial risk of a miscarriage of justice. [135-136]

At the trial of a .defendant charged with the murder of his mother, during which evidence of threats made by the defendant against his mother was introduced, the judge did not abuse his discretion in excluding evidence offered by the defendant concerning occasions when his mother had threatened him, where the proffered evidence was hearsay or too remote in time to be relevant. [136-138]

Although it was error in a murder case to admit evidence of the defendant's threats against a person who had informed the defendant's girl friend that the defendant had been unfaithful to her, the error was harmless in view of the considerable evidence of the defendant's guilt, other evidence of aggressive acts and threats by the defendant, the prosecutor's failure to mention the threats in closing argument, and the judge's instructions that the jury not consider evidence of threats as evidence of propensity to commit the crime charged. [138-139]

The judge in a murder case did not err in denying the defendant's motions for a mistrial or for individual questioning of jurors to determine if they had been prejudiced by certain newspaper articles published during the trial, where the judge, having followed the procedures set forth in *Commonwealth* v. *Jackson,* 376 Mass. 790, 800-801 (1978), was warranted in concluding that none of the jurors had been prejudiced. [139-142]

At the trial of a son and his friend for the murder of the son's mother, there was sufficient evidence to warrant a finding that the son had been a participant in his mother's murder. [142-143] NOLAN, J., dissenting.

At the trial of a son and his friend for the murder of the son's mother, there was sufficient evidence to warrant findings of deliberate premeditation by each defendant. [143-144]

At the trial of a murder case in which the defendants claimed that the victim's death was the result of an accident, the judge's failure to instruct the jury that the Commonwealth had the burden of proving that the death was not the result of an accident did not, in the circumstances, result in a substantial risk of a miscarriage of justice. [144-145]

INDICTMENTS found and returned in the Superior Court Department on February 5, 1982.

The cases were tried before *Travers,* J.

*Nancy Gertner* for Edward Palmariello.

*Richard W. Barry* for Bruce Chambers.

*Thomas J. Mundy, Jr.*, Assistant District Attorney (*Margaret Steen Melville,* Assistant District Attorney, with him) for the Commonwealth.

O'CONNOR, J.  On October 15, 1982, a jury found both defendants guilty of murder in the first degree of the defendant Edward Palmariello's mother. The prosecution's theory was that the defendants engaged in a joint enterprise. The trial judge sentenced each defendant to the Massachusetts Correctional Institution, Walpole, for a term of life imprisonment. The defendants now appeal from these convictions. Palmariello alleges that (1) the prosecutor committed improprieties in his closing argument; (2) several evidentiary rulings were erroneous; and (3) the judge should have granted his motion for mistrial or individual questioning of the jurors because of prejudicial publicity. Both defendants argue that (1) their motions for required findings of not guilty should have been granted; (2) the judge erred by failing to instruct the jury on the Commonwealth's burden of disproving accident; and (3) the court should exercise its powers under G. L. c. 278, § 33E, to vacate the verdicts and reduce them to manslaughter. We affirm the convictions of murder in the first degree.

The following facts were presented to the jury. On November 4, 1981, a group of hunters discovered a woman's body in a wooded area about 150 feet from Route 93 in southern New Hampshire. The body was facing downward in a crucifix position and was naked from the waist down, except for panties which had been partially removed. There was evidence of animal damage on one of the legs and a furrow on the front of the neck. The body was later identified as that of Marion Palmariello of East Boston. She had been dead for two to three weeks.

Marion Palmariello was about four feet, eleven inches tall, weighed between one hundred and one hundred and ten pounds, and was estimated to be between fifty and sixty years of age. She lived at 59 Marion Street, a three-decker house in East Boston, with her son, the defendant Edward Palmariello, who was seventeen at the time of the murder in October, 1981. Palmariello and the codefendant, Bruce Chambers, had been

friends for approximately one year at this time, seeing each other almost every day.

The Commonwealth introduced the following evidence of hostility between the defendants and Marion Palmariello. In January, 1980, during an argument with his mother, Palmariello waved an open switchblade knife at his mother. Palmariello threatened his mother "a lot" during 1980. They had several arguments in the period between November, 1980, and February, 1981; during one argument Palmariello stated, "If I had a knife, I'd kill you." In April, 1981, Palmariello stated that he would like to have his mother "committed." He said he would kill her if he couldn't "get her committed" and that he "wouldn't feel a bit of remorse." In June, 1981, the mother of one of Palmariello's girl friends discovered that her daughter had been living at the Palmariello house and went to take her daughter home. On this occasion, Palmariello yelled at his mother that he was going to kill her for telling the girl friend's mother about her daughter. He also threw something at his mother. He then stated that "he wasn't planning on killing her then, that he had to think about it, plan it, because he wasn't going to go to jail for her or anybody else." In the summer before the murder, Palmariello had an argument with his mother concerning money. Palmariello slapped her in the stomach, swore at her, and said, "Shut up or I'm going to cut you up and put you into the toilet bowl." On September 21, 1981, Palmariello stated to his probation officer that "he could't stand [his mother's] nagging and that he was going to shut her up." Finally, one or two weeks before the murder, the defendants were listening to music with a friend in Palmariello's house. When Marion Palmariello yelled at her son, Chambers said, "I'd like to take his mother and tie her up and gag her and stick her on the first floor just to shut her up." Palmariello responded to his comment by laughing. A witness testified that "[i]t didn't seem to bother him at all." This evidence of hostility between the defendants and the victim was introduced to show the defendants' state of mind on October 18, 1981.

Chambers testified that on that day, he and Palmariello were painting the second floor walls and repairing the plaster on the

third floor walls of the Palmariello house. They worked from approximately 7 P.M. to 8 P.M., on the third floor. When Chambers finished working, he walked into the kitchen, where the mother was watching television. Palmariello ended a telephone conversation and announced that he was taking some paint downstairs, contrary to his mother's wishes. She said, "Eddie [Palmariello], don't start," and Chambers said, "I'll hold her." Chambers was standing behind her, holding a cord he had been using to measure the holes in the wall. He threw the cord over her head as she got up to get the paint. Chambers was "meaning to hold her," and "meaning for [the cord] to go around her waist." The cord was pulled out of Chambers' hands as she was going forward. She fell, and her head hit the floor. After determining that she was dead, Palmariello suggested that they call the police, and Chambers said, "You're just as much at fault as I am."

There was considerable evidence of consciousness of guilt. Chambers testified that, after the murder, the defendants removed the victim's jewelry to make it appear that she had been robbed, and they put her body in a box. They stole a car, placed the box in the car, and drove off on the highway. Eventually, they stopped, carried the body over a fence, and dragged it through the woods.

Several witnesses testified to statements by Palmariello that showed consciousness of guilt. In the period following his mother's death, Palmariello stated that he did not know where his mother was, that she might be at her father's house, in the hospital, or in New Hampshire. He also filed a missing person report with the police on October 23, and caused his probation officer to report the situation to the Department of Social Services.

There was testimony that on the day after the murder the defendants were in the company of Chambers' sister and one of her friends at Chambers' sister's house. The friend, who was also a girl friend of Palmariello, testified that Chambers' sister asked her, "Did they tell you what happened?" and that she answered, "Yes." The witness testified that Chambers' sister "said that they were crazy and that this is all we know about

it and that we keep our mouth shut." The witness also testified that later that day she was present in the Palmariello house with the defendants and that they were playing cards in the kitchen when she asked the defendants "where it had happened." She told the jury that "they both" said that it had happened in the chair she was sitting in. The witness testified that she jumped up from the chair and that "they" laughed when she did so. She also said that Palmariello stated that Chambers had been "wicked nervous." The witness further testified that Chambers then demonstrated "how he did it." The witness showed the jury what Chambers did in giving that demonstration to her. She also testified that, when she asked if the victim had struggled, Palmariello said, "She didn't know what hit her," and Chambers "just went 'Blah.'"

There was evidence that on November 7, the defendant Chambers, after learning that girl friends of the defendants knew about Palmariello's mother, said to them, "You better keep your mouth shut or you won't have a mouth to shut." Later, when Chambers was alone with his girl friend, he stated that "he didn't know why he did it and he wasn't insane." The next day, during an argument with his girl friend, Palmariello stated, "I know you know about what I did to my mother."

There was testimony that on November 10, another girl friend of Palmariello discovered a strobe light at his house, which she had seen him handling the day before. Taped inside the strobe light box was a bag containing jewelry. When she later spoke with Palmariello about this jewelry, he said, "Well, don't give it to nobody. Keep it, because it can get yourself into trouble. If you tell anybody you have it, you're going to get yourself into trouble." Some of this jewelry belonged to the victim.

Three medical experts testified as to the cause of the victim's death. The doctor who performed the autopsy stated that the deceased had a furrow on her neck one-quarter inch wide and one-quarter inch deep, from ear to ear, with characteristics which are "consistent with a cord of some type." Sustained pressure was required to create such a furrow. His opinion was that ligature strangulation was the cause of death. He also noted

injuries to the victim's forehead, chest, and neck, which were independent of the ligature injury and occurred prior to death. The defendants' expert, while agreeing that sustained pressure had been applied to the ligature, would not express an opinion as to the cause of death because of three lung diseases which he said could have contributed to the victim's death: emphysema, asthma, and pneumonia. The Commonwealth's rebuttal expert testified that the victim died as a result of a ligature strangulation, and that the lung diseases merely hastened her death. He said that "a sustained, great force was applied on the neck."

1. *The Prosecutor's Closing Argument.*

Palmariello argues that the prosecutor made several improper statements in his closing argument. Palmariello made timely objections to three alleged misstatements of the evidence, but was overruled in each case. "Counsel has the right to argue inferences from the evidence favorable to his case, and the precise form should not control unless it tends to lead the jury to an improper inference not from the evidence but from the apparent personal knowledge of the attorney." *Commonwealth v. Nordstrom,* 364 Mass. 310, 315 (1973). Each of the three alleged misstatements was a proper inference from the evidence. The statement that there was "medical testimony from which you can infer that these injuries were inflicted by more than one individual" was warranted by evidence that the ligature injury and the injuries to the victim's neck, forehead, and chest were independent and the evidence that both defendants were present at the scene of the crime. The statement that "my recollection of the evidence was [Palmariello's sister] said [the defendant's argument and threat to his mother] was [in] the summer of 1981" could, as the trial judge stated, be "fairly inferred" despite the witness's confused assertions under cross-examination as to the year in question. Finally, the statement, "[D]id someone get the bright idea: 'Let's make it look like a rape?'" referring to the abandonment of the body, was inferable from the evidence of the partially clothed body's position and testimony of the pathologist that he had examined the body for evidence of sexual assault because of its condition and found none.

Each of the three alleged misstatements was a proper inference from the evidence.

Palmariello did not object to the other alleged improprieties in the prosecutor's closing. In this situation, "it is proper for us to examine the alleged prejudicial statements against the background of the entire case to determine if a miscarriage of justice has occurred." *Commonwealth* v. *Nordstrom, supra* at 314. See *Commonwealth* v. *Mandeville,* 386 Mass. 393, 411 (1982). Palmariello first argues that the prosecutor's statement that Palmariello said to his girl friend, "You know about me killing my mother," was a misstatement, and not an inference from the testimony, which was that Palmariello had said, "[Y]ou know about what I did to my mother." He argues that the testimony at trial showed that he was referring merely to his actions in assisting Chambers after the murder, and not to his participation in the crime. Although the remark was erroneous, in the absence of an objection at trial (which would have allowed the judge to give a curative instruction), we do not see it as reversible error because (1) although the prosecutor reformulated the testimony, it could be inferred that Palmariello's comment was in reference to the killing and not the cover-up, since Palmariello would have less reason to fear his girl friend's knowledge of his participation in the latter, and (2) the judge instructed the jury that the lawyers' remarks are not evidence, that the jury's memory controls, and that they should ignore anything said by the lawyers which did not accord with their memory. See *Commonwealth* v. *Roberts,* 378 Mass. 116, 123 (1979); *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 419 (1978).

The final "misstatement" which Palmariello attacks is the prosecutor's argument that the jury can infer from Palmariello's presence at the scene of the crime and participation in the cover-up that he also participated in the murder, because "how could a son, or how would a son, if he wasn't involved in this act himself, or at least acquiesc[ing] and encouraging the other guy, how it possibly could have been committed in his presence if he didn't share the same intent to see the death of his mother that the person did that had the cord." Palmariello contends that

this argument assumes a normal relationship between himself and his mother, a fact which, he says, was directly contradicted both by the evidence at trial and by evidence that was excluded. We disagree. It was not essential to the prosecutor's argument that Palmariello and his mother had a "normal" relationship. The prosecutor was entitled to ask the jury to use their common sense in considering whether a son, irrespective of the hostility which may have existed between him and his mother, would have refrained from taking action to prevent her brutal death in his presence and would have assisted in its cover-up if he had not wished the death to occur.

We also disagree with Palmariello's contention that the prosecutor's reference to the son's "moral obligation" to help his mother improperly put Palmariello's character in issue.[2] This was merely an effort by the prosecutor to remind the jury to use their common sense and everyday experience in evaluating the testimony. "[T]he prosecution was entering into speculations about the probable motivations and behavior of such actors in such a situation when confronted with the homicide. . . . [W]e must attribute a certain sophistication to the jury." *Commonwealth* v. *Johnson,* 372 Mass. 185, 197 (1977). See *Commonwealth* v. *Campbell,* 378 Mass. 680, 703-704 (1979); *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 420 (1978).

Palmariello next objects to the prosecutor's comment that "if gullible juries decided these cases without the aid of their good common sense, or went upstairs to their deliberation rooms and conducted a search for doubts as an excuse to acquit a defendant, and the hoodlums in our society may come to believe that murder can be committed without certainty of conviction, human life will become very cheap." Palmariello argues that by these remarks the prosecutor encouraged the jury "to eschew its responsibility to acquit the defendant if there is any reasonable doubt because of the harm that would

---

[2] The prosecutor stated, "But when you're talking about your own mother, do you feel, as people of good sense and good judgment, that there would have been a moral obligation for him to act if he was not in on it with [Chambers]?"

result from a 'search for doubts.'" We observe that the prosecutor's argument was not directed simply to a search for doubts but rather to a search for doubts "as an excuse to acquit a defendant." However, we agree with Palmariello that the reference to the consequences of the jury's decision is improper, *Commonwealth* v. *Smith,* 387 Mass. 900, 910-911 (1983); *Commonwealth* v. *Burke,* 373 Mass. 569, 576 n.3 (1977), and that the prosecutor's comment included such a reference. Furthermore, the argument was improper in that it asked the jury to decide the case on general considerations. *Commonwealth* v. *MacDonald (No. 1),* 368 Mass. 395, 402 (1975). Nevertheless, we are satisfied that these improprieties were corrected by the judge's instruction to the jury to decide the case on the evidence produced in the courtroom.

The next statement which Palmariello challenges concerned the rights of the victim. The prosecutor stated, "[L]et's not lose sight of the fact that [the victim] is in Holy Cross Cemetery beneath six feet of dirt; and [she] also had constitutional rights. She had a right to life. She was deprived of that right. She had a right to make her peace with her God. She was deprived of that right." Although these remarks come very close to an improper appeal to sympathy, we think that, in light of the prosecutor's next statement, "Chambers and Palmariello stand before you for justice[;] [a]gainst them as individuals the law holds no hostility," and the judge's instructions that the jury decide the case on the evidence, there is no substantial risk that a miscarriage of justice occurred. See *Commonwealth* v. *Quigley,* 391 Mass. 461, 464 (1984); *Commonwealth* v. *Hoffer,* 375 Mass. 369, 379-380 (1978).

Palmariello's last complaint about the Commonwealth's closing argument is that the prosecutor appealed to the jury's passions and prejudices. He argues that the prosecutor unfairly emphasized the element of matricide, which was likely to inflame the jury. Our review of the argument indicates, however, that the prosecutor was careful to limit his references to the mother-son relationship to instances where he asked the jury to consider that relationship as an aid in determining what Palmariello's conduct and state of mind were. As we have noted,

*supra* at 133-134, these references were proper. Palmariello also argues that the prosecutor should not have stated that the victim's "body is rotting up in the New Hampshire woods, being eaten by animals, and [Palmariello's probation officer] brings a complaint against her for neglect of a minor child!" These comments were based on evidence introduced at trial, and the judge instructed the jury that "any deterioration that a corpse suffered in the woods in New Hampshire, in and of itself, is no evidence that bears upon the guilt of the defendant. So don't allow that sort of thing to affect you in any way, emotionally or otherwise." In these circumstances, we do not find a substantial risk of a miscarriage of justice in the prosecutor's comments.

2. *Evidentiary Rulings.*

(i) The Commonwealth presented evidence of several occasions on which Palmariello had threatened his mother. That evidence was introduced to show Palmariello's hostility and ill will toward his mother, and a motive for him to kill her. Palmariello argues that the judge erroneously refused to allow him to elicit testimony concerning occasions when his mother had threatened him. He argues that the judge's rulings prevented him from showing that "mutual threats and aggressive acts were not abnormal in this unhappy household, but were part of the usual pattern of communication between mother and son." Such evidence, he argues, would tend to negate the inference of motive and malice in his acts. Citing *Commonwealth* v. *Hicks,* 375 Mass. 274, 277 (1978) ("A criminal defendant may not be prevented from explaining seemingly incriminating evidence offered by the prosecution"), Palmariello concludes that his due process rights and his right to present a defense under both Federal and State Constitutions have been violated.

The judge did not refuse to allow Palmariello to elicit eyewitness testimony concerning occasions, not too remote in time, when Palmariello's mother had threatened him. Palmariello first attempted to elicit testimony concerning the relationship between himself and his mother by cross-examining his sister. The judge stated that "[i]f you want to ask whether [the mother] threatened him, go to it." We agree with the judge, however,

that the questions asked by Palmariello called for either hearsay evidence or evidence that the judge could properly consider to be too remote in time. The judge ruled that evidence of hostilities in 1979 was too remote to be relevant to the circumstances of a murder in October, 1981. "Whether evidence is legally relevant is a question which is generally left to the discretion of the trial judge. . . . The proximity to the crime in point of time is an element which the judge in his discretion may consider in viewing the probative value of evidence." *Commonwealth* v. *Chasson,* 383 Mass. 183, 187 (1981). See *Commonwealth* v. *Ramey,* 243 Mass. 394, 397 (1923). The judge's decision here was not an abuse of discretion.

Palmariello later tried to present evidence of his mother's threats through the testimony of his probation officer, who had known him for three years at the time of the murder. Again, the judge allowed this inquiry, "so long as the witness can establish the occasion, can relate who was there, and if the occasion is relevant to the time period." The judge correctly ruled that Palmariello's questions were too vague and not properly restricted to specific occasions witnessed by the probation officer. Palmariello argues that he should have been permitted to inquire as to statements he made to the probation officer about threats his mother made to him. He argues that the statements were admissible as showing his state of mind in that they demonstrated his "perceptions of the victim." We are satisfied, however, that the statements were not admissible. We are unable to see how the defense would be aided by evidence simply that Palmariello *thought* his mother had threatened him. If such evidence were relevant at all, it would seem to cut against him rather than in his favor. It would not have established a "usual pattern of communication between mother and son." The only function of the evidence would have been to prove the fact asserted by Palmariello's out-of-court statement, thus making the statement inadmissible hearsay. That that indeed was Palmariello's purpose in offering the testimony is made manifest by the conference at the bench between counsel and the judge. Counsel for the defendant explained, "What I propose to examine is on this: The day before

Mrs. Palmariello went to the hospital, he had a fight with his mother and girl friend. His girl friend called him retarded and his mother hit him with a board. He retaliated by smashing a cup with a knife. That's it." The judge then asked counsel why she was going into conversations, and she replied, "Because there are two ways in which this could be introduced. One is direct observation; the other is [the probation officer's] conversations with Eddie [Palmariello]. Eddie says to her, 'My mother threatened me. My mother hit me with a board.' That is his perception of the victim." .

(ii) Palmariello objected to testimony concerning threats he had made to a third party three weeks after the murder.[3] One of Palmariello's girl friends, who knew about the death of the victim and testified at trial as to admissions made by the defendants, was told by a friend that Palmariello had been unfaithful to her. Two witnesses testified that, after learning that this person had revealed his duplicity, Palmariello told her that he would kill her because of what she had said to his girl friend. Palmariello argues that this testimony concerned a romantic triangle in which Palmariello was involved and was irrelevant to the murder of his mother since it revealed nothing about the relationship between Palmariello and his mother. He says that the evidence was inadmissible because its only relevance was to prove his bad character, which was unfairly prejudicial to him.

A defendant's bad character or his commission of bad acts, either prior to or subsequent to the crime for which he is charged, are not admissible to prove the likelihood that the defendant committed the crime with which he is charged. *Commonwealth* v. *Perez,* 390 Mass. 308, 317 (1983). *Commonwealth* v. *Valcourt,* 333 Mass. 706, 717-718 (1956). P.J. Liacos, Massachusetts Evidence 420-422 (5th ed. 1981). However, "evidence otherwise relevant to the crime charged is not rendered inadmissible merely because it tends to prove the commission of another crime or to cast the defendant in an un-

---

[3] Palmariello also filed a motion in limine to exclude this evidence. The motion was denied.

favorable light." *Commonwealth* v. *Perez, supra.* The Commonwealth argues that the evidence of Palmariello's threats against the informant of his girl friend was admissible to show his consciousness of guilt. The Commonwealth reasons that, as long as his relations with his girl friend were stable, Palmariello did not need to fear that she would reveal his crime, but once she suspected him of infidelity, he would no longer be able to trust her to keep his secret. His threats to the informant of his girl friend, the Commonwealth says, demonstrate his recognition of the importance of maintaining a good relationship with his girl friend. That, in turn, says the Commonwealth, permits an inference of consciousness of guilt. We disagree.

It was error to admit that evidence. The connection between Palmariello's response to the informant's statement to his girl friend and his consciousness of guilt is too tenuous to permit the introduction of prejudicial bad character testimony. It is just as likely that the incident arose solely from a romantic triangle. The error was not reversible, however, because it was harmless. The evidence implicating Palmariello in the murder was considerable. Also, there was other evidence showing that Palmariello had assaulted his girl friend on two occasions, and that he frequently threatened to kill his mother. We think that it is unlikely that the threat to the informant had any additional impact on the jury. The prosecutor did not refer to the incident in his closing argument, and the judge carefully instructed the jury not to consider evidence of threats as evidence of propensity to commit the crime charged. We are unwilling to assume that the jury ignored those instructions. See *Commonwealth* v. *Leno,* 374 Mass. 716, 719 (1978).

3. *Pretrial Publicity.*

After the first day of the jury empanelling, the judge instructed the seven jurors who had then been chosen that they should keep their minds completely open and should not investigate, seek information about, or even permit others to talk to them about the case. On the following day, the judge instructed the eleven jurors who had been empanelled then that they should not talk to other people or allow other people to talk to them about the case, that they should not investigate, and

that the evidence is only what they would hear in the courtroom or see on a view. After the completion of the empanelling on the next day, before the jury was taken on a view, the jury were instructed not to ask questions or talk to other people or even allow others to speak to them about the case, because "[n]othing outside [the courtroom evidence or what they would see on the view] that comes to you from any other source is evidence." The judge was not present on the view that afternoon, so the jury received no instruction at the end of the day.

On the next day, a Saturday, an article appeared in the Boston Herald American newspaper which was the subject of a motion for mistrial by the defendants on Monday, the first day of the trial. The grounds for the motion, which was supported by affidavit, were that the article, which was headlined, "Mom-slay jury visits death site," contained inadmissible evidence, including references to Palmariello's juvenile record, and prejudicial misstatements of fact. The motion stated that several members of the venire from which the jury were selected had testified that they "remembered" the case. Palmariello's counsel argued that it was likely that members of the jury had seen and might be prejudiced by the article, particularly since the judge's instructions had made no reference to publicity. The defendants moved for a mistrial, or in the alternative individual voir dire of the jurors by the lawyers or by the judge using certain requested questions.

The judge denied the motion for a mistrial after he questioned each of the jurors individually. Only three jurors responded affirmatively to his question whether any information related to the case had come to their attention after the view. The first stated that she had "glanced through" the article, but would be able to disregard it and decide the case solely on the basis of the evidence in the courtroom and on the view. The second stated that his son had mentioned the article but that he refused to talk about it or read it. The third stated that another juror had mentioned the article in the jury room and had spoken of reading the headline but not the text of the article. On the basis of the jurors' answers to his questions the judge denied the motion for a mistrial. He then instructed the jury to avoid and

ignore any outside information concerning the case, "whether it comes to your attention through the media or from some individual: by any means." At the end of the day, he again advised the jury not to investigate the case or pay any attention to outside information or permit others to talk to them about it.

On the following day, the defendants moved for a mistrial or individual polling of the jury and sequestration of the jury because of articles in two newspapers about the proceedings of the day before. The front page headline of one paper stated, "KILLING MOM WAS A JOKE." The judge questioned the assembled jury whether any of them had received any information on the case, referring in particular to newspaper articles. Three jurors responded affirmatively, and the judge interrogated them individually. Each of them stated that he or she had seen the headline but could not remember exactly what it said, that he or she had not read the article, and that seeing the headline would not interfere with his or her ability to reach a verdict based solely on the evidence. The judge denied the defendants' motion.

On each of the six succeeding trial days and on the single day of jury deliberation, the defendants moved for mistrial or, in the alternative, an individual polling of the jury, because of publicity in the newspapers. On each day, the judge denied the motions and instead made a general inquiry of the assembled jurors whether they had seen, heard, or read any outside information relating to the trial. The jury's response was negative on each day. At the end of four of the succeeding trial days, the judge instructed the jury to keep an open mind and to avoid discussion, reading, or investigation concerning the case.

Palmariello now requests that his conviction "be reversed because of the court's failure to take adequate measures to ensure that the jury remained fair and impartial throughout the trial." He asserts that the judge should have declared a mistrial or conducted individual inquiry of each juror concerning exposure to newspaper publicity, and that the judge's failure to do so violated his right to a fair trial guaranteed by the Federal and State Constitutions. We disagree. The judge consistently followed the procedures which are required pursuant to our

directions in *Commonwealth* v. *Jackson,* 376 Mass. 790, 800-801 (1978), and he was satisfied, on the basis of his interrogation, that none of the jurors had been prejudiced. He had a right to rely on their responses to his questions. *Commonwealth* v. *Grant,* 391 Mass. 645, 653 (1984).

4. *Motions for Required Findings of Not Guilty.*

Chambers moved for required findings of not guilty of murder in the first degree, murder in the second degree, and manslaughter. Palmariello made the same motion as to murder in the first degree and murder in the second degree. Those motions were made at the close of the Commonwealth's case and again at the close of all the evidence and they were denied. Palmariello now challenges the denial of his motion with respect to the charges of murder in the first degree and murder in the second degree. Chambers challenges the denial of his motion for a required finding of not guilty of murder in the first degree.

We must determine whether the evidence, including inferences that are not too remote according to the usual course of events, "read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Basch,* 386 Mass. 620, 622 (1982). We consider the state of the evidence both at the close of the Commonwealth's case and at the close of all the evidence. *Id.*

First we consider Palmariello's claim that the evidence was insufficient to warrant a finding that he was a wilful participant in his mother's murder. The case was tried on a joint enterprise theory, which holds that "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal." *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "Murder is the unlawful killing of a human being with malice aforethought." *Commonwealth* v. *Campbell,* 375 Mass. 308, 312 (1978). "Malice aforethought includes any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow." *Commonwealth* v. *Huot,* 380 Mass. 403, 408 (1980). We think that the

evidence was sufficient to warrant an inference that Palmariello participated in the killing with the state of mind required for murder. The doctor who performed the autopsy testified that the victim had been strangled by a cord that had been applied to her neck with sustained pressure and that, in addition to the neck injury caused by the cord, the victim's forehead, chest, and neck were injured before she died. That Palmariello was at least present during the infliction of those injuries was shown by his statements, presented as revelations of first-hand information, that Chambers was "wicked nervous" and the victim "didn't know what hit her." That evidence, together with the evidence that Palmariello had been hostile toward his mother and the evidence that he had admitted to his girl friend that he knew that the girl friend knew "what [he] did to [his] mother," augmented by the substantial evidence of his consciousness of guilt, warranted the jury's conclusion that Palmariello was a wilful participant in the murder.

Palmariello also argues that, even if there was sufficient evidence to warrant a finding that he was guilty of murder, there was insufficient evidence to warrant a finding of deliberate premeditation by him. G. L. c. 265, § 1. Deliberate premeditation was the only basis for murder in the first degree that was presented to the jury. Chambers also argues that there was insufficient evidence to warrant a finding that he deliberately premeditated the murder.

"Deliberate premeditation means that the plan to kill was formed after deliberation and reflection. However, no particular length of time is required in order for deliberate premeditation to be found." *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974). "It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905).

Palmariello and Chambers argue that the circumstances of this murder are similar to those in *Commonwealth* v. *McInerney*, 373 Mass. 136 (1977), where we held that the evidence did not support a finding of premeditation. In *McInerney, supra*

at 154, the evidence showed no history of hostility between the defendant and the victim. In that case the defendant went to the victim's apartment at the victim's invitation, unarmed and with no plan or purpose to inflict harm. When the victim laughed at the defendant's impotence, he strangled her with a cord "fortuitously within reach." Palmariello and Chambers argue that they similarly did not plan to murder the victim, and that the presence of the rope, which had been used for measuring holes in the walls, was fortuitous. They correctly assert that evidence of consciousness of guilt (concealing the body, fabricating stories about the victim's whereabouts) is not evidence of premeditation. See *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978).

However, here, in addition to "sustained, great force . . . applied on the neck" there were independent injuries to the victim's forehead, chest, and neck that occurred prior to death. That was enough to show that the participants deliberately premeditated. Such a finding with respect to Chambers was further supported by the evidence that when the ligature was applied he was "wicked nervous." The finding that Palmariello deliberately premeditated finds further support in the evidence, not present in *Commonwealth* v. *McInerney, supra,* that he was hostile toward the victim before the day of the crime.

5. *The Judge's Instruction on Accident.*

Both defendants argue that the judge erred in not instructing the jury that the Commonwealth had the burden of proving that the victim's death was not an accident. They state that the issue of accident was fairly raised by testimony that Chambers and his sister had referred to the death as an accident, by Chambers' statement to Palmariello immediately after her death, "Eddie, it was an accident," and by Chambers' account of how the victim died. Palmariello requested an instruction on accident, but the judge stated that there was no evidence of accident and the real issue was proximate cause. Counsel for Palmariello agreed to withdraw the request for an accident instruction if the judge instead instructed the jury on proximate cause. The judge charged the jury on proximate cause and stated that "an accident is not a crime," but did not refer to the

Commonwealth's burden on the accident issue.[4] The parties did not object to that portion of the charge. In the absence of an objection, we review the jury instructions under G. L. c. 278, § 33E, to determine if there is a substantial likelihood of a miscarriage of justice.

There was no error. We have held in cases involving shootings claimed by the defendants to have been accidental, that, when the issue of accident is fairly raised, the judge, at least on request, is obliged to charge the jury that the Commonwealth has the burden to prove beyond a reasonable doubt that the shooting was not accidental. See *Commonwealth* v. *Zezima,* 387 Mass. 748, 756 (1982); *Commonwealth* v. *Zaccagnini,* 383 Mass. 615, 616 (1981); *Lannon* v. *Commonwealth,* 379 Mass. 786, 790 (1980). Here, however, although the defendants claim that the death was accidental, there was no evidence and the defendants do not argue that Chambers' conduct was accidental. Chambers testified that he "threw the cord meaning to hold [the victim], and she fell." This case does not come within the principle of the cases cited immediately above. "A trial judge is not required . . . to charge on an hypothesis which is not supported by evidence." *Commonwealth* v. *Costa,* 360 Mass. 177, 184 (1971).

6. *Review Under G. L. c. 278, § 33E.*

We have carefully reviewed the entire record and we conclude that the interests of justice do not require us to exercise our powers under G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[4] The portion of the charge referring to accident stated that "an accident is not a crime. If I go running down the sidewalk and I wheel around the corner and run into someone, that may be pure accident, for which I am blameless. On the other hand, if I run into them intentionally, then it may well be an assault and battery and it could be at least a manslaughter if the person died. Because a manslaughter is an assault and battery resulting in death. But you see the critical difference, which is the intent. Here, if you believed that you were dealing entirely with a horseplay type of thing with no intent to hold or restrain, that could be pure accident and that would result in a verdict of not guilty." Later in the instruction, the judge repeated, "[A homicide] is not criminal, and [is] excusable, when it results from pure accident."

NOLAN, J. (dissenting). I concur with the result reached by the majority with respect to the defendant Bruce Chambers. However, I respectfully dissent from the result reached with respect to the defendant Edward Palmariello. The court concludes that the Commonwealth produced sufficient evidence to warrant a finding that Palmariello participated as a principal in the killing of Marion Palmariello. The court relies primarily on the following evidence to substantiate an inference of participation: (1) Palmariello's first hand information about the murder, which established his presence; (2) the subsequent cover-up, which established consciousness of guilt; (3) his so called admission to his girl friend that he knew that she knew "what [he] did to [his] mother"; (4) his threats to his mother, which established hostility; and (5) the injuries to the victim's forehead, chest, and neck. After reviewing the record, I agree with the court that this is the only evidence which tends to support a finding of wilful participation. However, I do not agree that this evidence is sufficient to warrant a finding of murder in the first degree beyond a reasonable doubt.

"In reviewing the denial of a motion for a directed verdict in a criminal case, we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Funches,* 379 Mass. 283, 294 (1979). I believe that the evidence produced by the Commonwealth does not satisfy this test.

It is well settled that mere presence at the site of the crime or knowledge that the crime is to be committed, even when coupled with failure to take affirmative steps to prevent it, does not make one guilty of the underlying crime. *Commonwealth* v. *Clark,* 363 Mass. 467, 473 (1973). The fact that Palmariello knew Chambers, associated with him, and was in his company before and after the crime is not enough. *Commonwealth* v. *Perry,* 357 Mass. 149, 151 (1970). Even if the jury inferred from the evidence at the trial that Palmariello was present during the infliction of the injuries and in fact aided

Bruce Chambers afterwards in concealing the crime, this is not enough to convict Palmariello of being a principal without proof of some degree of actual participation. See *Commonwealth* v. *Benders,* 361 Mass. 704 (1972).

The remaining evidence which provides a basis for inferring Palmariello's wilful participation in the murder is his so called admission to his girl friend, the evidence of hostility, and the victim's injuries. Although the jury may have inferred that, in his statement to his girl friend, Palmariello meant that he "killed" his mother, an equally plausible inference was that he was referring to his subsequent act of placing the corpse in the woods in New Hampshire. In my opinion, this statement, even when read in light of his hostility toward his mother and the victim's injuries, was insufficient to persuade a rational jury beyond a reasonable doubt that the defendant participated in his mother's murder. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). The evidence is simply too thin.

For these reasons I would reverse the judgment of guilty of murder in the first degree as to Palmariello.