COMMONWEALTH *vs.* KAREN· A. COKONOUGHER.

No. 90-P-1419.

Barnstable. September 11, 1991. - January 31, 1992.

Present: ARMSTRONG, DREBEN, & GREENBERG, JJ.

*Homicide. Evidence*, Prior misconduct, Relevancy and materiality, Photograph. *Intent. Error*, Harmless. *Malice.*

At the trial of a mother found guilty of manslaughter in the death of her infant son, it was error to admit evidence concerning her treatment of her other children, where the conduct in question occurred at least seven months prior to the victim's death and where the mother's prior parental unfitness did not support the Commonwealth's theory that she intended violent, aggressive acts toward the victim [58-60]; inasmuch as the evidence at the trial was largely circumstantial and the question as to the cause of the victim's death was close, this court concluded that the error required reversal [60-61].

At the trial of a murder indictment, the evidence was sufficient to warrant the jury's finding the defendant guilty of manslaughter in the death of her infant son. [61]

At a murder trial, the judge acted within his discretion in admitting photographs of the victim's body. [62]

INDICTMENT found and returned in the Superior Court Department on July 5, 1989.

The case was tried before *Gerald F. O'Neill, Jr.,* J.

*Russell J. Redgate* for the defendant.

*Julia K. Vermynck,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. The defendant and Kevin Murphy, who had lived together for five years but were unmarried, had a second son, Kyle Murphy, on July 18, 1988. The couple's first son, Kevin, Jr., was not living with his parents at the time of Kyle's birth. Prompted by reports of neglect, the Department of Social Services (DSS) had removed him on Feb-

ruary 12, 1988.[1] Despite this, the first few months of Kyle's infancy seemed unremarkable. In November of 1988, however, Kyle became rundown and listless, beset with a chest cold and an ear infection. Kevin Murphy gave him a prescribed antibiotic on the evening of November 15, and then put him to bed in his room. The following morning the defendant frantically went to a neighbor's house and repeatedly cried "my baby, my baby." The neighbor and the defendant then went back to the defendant's cottage where Kyle was dead in his crib. After a prolonged investigation, the defendant was indicted on one count of second degree murder and brought before a jury for trial. She was convicted of manslaughter. On appeal, she contends: (1) the evidence was insufficient to sustain a guilty verdict; (2) certain evidence of her parental conduct should have been excluded; and (3) photographs of the deceased child should not have been admitted in evidence.

There is merit to the claim that the judge improperly admitted evidence of neglect of her other children, particularly Kevin, Jr., over a reasoned and pointed objection. Based on our review of the record at trial, we conclude that the error was unduly prejudicial and order that the judgment be reversed and the verdict set aside. We comment briefly on the defendant's other contentions, as the same issues may arise in any subsequent trial.

*The testimony at trial.*

We describe so much of the factual background as is necessary to place each of the judge's rulings in context. On November 16, 1988, at about 8:45 A.M., three members of the Dennis fire department, who were also paramedical technicians, arrived at the defendant's cottage in response to her telephone call. The police officer who subsequently arrived described to the jury his observations of certain marks on Kyle "around the chin area," which he referred to as a "possible abrasion." Other evidence was presented that the infant

---

[1] Although these facts were not clearly developed in the record, it appears that three other children, all under the age of eight years, were taken from the defendant's custody.

had developed a rash around his chin and left cheek several days before his death. The defendant was in charge of the child all night; his father slept in a separate bedroom. The defendant checked on the child twice before morning and apparently found nothing unusual.

Kyle's body was brought to the University of Massachusetts Medical Center in Worcester, where an autopsy was performed after 4:30 P.M.[2] X-rays disclosed no fractures of the arms or legs. A microscopic examination of facial tissue taken from the marked area proved unenlightening. The Commonwealth's leading expert witness at trial, Dr. Blackbourne, explained that he was initially unable to form a conclusion as to the cause of death, and therefore ordered additional fluid and tissue tests.

Ultimately, the presence of the facial marks, a fabric impression found in Kyle's lip, and the absence of flat, "meaty" lungs (a sort of abnormality commonly present in cases of sudden infant death syndrome or SIDS), as well as other forensic data, such as the position of Kyle's body in the crib, convinced Dr. Blackbourne that the cause of Kyle's death was asphyxia by smothering. He opined at trial that the child's facial abrasions could not have been caused by Kyle's rubbing his head back and forth on the crib sheet or mattress, and discounted the explanation, offered by the defendant's witnesses, that the marks were secondary to a skin rash.

The jury also heard from a defense expert, Dr. Edward Sussman, a medical examiner who listed an impressive array of credentials at trial, and was chief of pathology at Worcester City Hospital. He examined wet tissue samples and microscopic slides prepared from evidence taken at Kyle's autopsy and opined that Kyle had suffered from some sort of respiratory tract infection and a skin rash. In his opinion, the marks on Kyle's face showed signs of "vital reaction"; this, he testified, indicated that the marks were perhaps present

---

[2] The autopsy was performed by Dr. William Zane and supervised by Dr. Brian Blackbourne, formerly chief medical examiner of the Commonwealth. Both physicians later appeared as witnesses for the prosecution.

for a couple of days prior to the baby's death. In sum, he concluded that the infant died of SIDS.[3]

The Commonwealth shored up its case based on the physical evidence and medical testimony by offering a great deal of "character type" testimony; this evidence ostensibly bore on the defendant's state of mind. Prosecution witnesses were permitted to describe incidents of the defendant's behavior toward Kyle which tended to portray her as an uncaring and unfit mother. One neighbor testified she heard the defendant utter: "[I] wished [I] never had [Kyle]." Others suggested that the defendant neither properly fed nor properly clothed the child.

In addition to this testimony regarding the defendant's treatment of Kyle, the Commonwealth, over the defendant's objection, also submitted testimony regarding the defendant's treatment of her other children. Officer Gonsalves, a State police investigator who responded to the defendant's home on the morning of Kyle's death, testified that, although the defendant had several other children under the age of eight, none of them was present in the home upon her arrival. This testimony, in our opinion, proved particularly damaging; we believe this to be so because of the evidence, presented by a DSS worker, that Kevin, Jr., was removed from the home just nine months prior to the death of Kyle. From this combined testimony, the jury could have inferred that all of the defendant's children were in foster care by November of 1988. The judge also allowed DSS social workers to describe, in graphic detail, the deteriorating and filthy condition of the defendant's home in February of 1988. Finally, two neighbors, one of whom was a registered nurse, confirmed this state of affairs based on their own visits, and added that Kevin often appeared "very sick" and neglected.

---

[3] Dr. Sussman testified that the term sudden infant death syndrome is used to describe "a group of deaths which occur in infants, people in the age range of four months, which have no obvious explanation based on a careful and complete autopsy, as well as a review of the clinical history, scene investigation, and other ancillary studies."

1. *The evidence of prior acts involving the other children.*
(a) *Was there error?*

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character, or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence is relevant and admissible if it "relates to a subsidiary issue, such as the state of mind of the defendant, and is not offered to prove his guilt but rather to prove a relevant subsidiary fact. See Proposed Mass.R.Evid. 404(b) (1981)." *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985).

These basic principles were applied in *Commonwealth* v. *Gallison*, 383 Mass. 659 (1981). In *Gallison*, where Denise Gallison was found guilty of manslaughter in the death of her daughter, the court held that evidence of the defendant's simultaneous abuse of her son, not named in the manslaughter indictment, was properly admitted to prove the "defendant's reckless and wanton state of mind." *Id.* at 672-673. The court reasoned that such evidence was admissible because it "formed a temporal and schematic nexus . . . [and] show[ed] a common course of conduct regarding the two children." *Ibid.* The nexus test was acknowledged by the judge in the instant case in his discussion with counsel before he allowed the testimony. We think the judge was mistaken in admitting testimony exposing the defendant's past parental transgressions involving her other children.[4] The Commonwealth's theory of the case was that the defendant's violent, aggressive act toward Kyle could only be explained as the product of deep parental frustration; consequently, evidence of her treatment of the other children was admissible.

What distinguishes this case from *Gallison, supra*, however, are two factors — one, the evidence concerning the treatment of her other children, particularly Kevin, indicated that it took place at least seven months prior to Kyle's death

---

[4] Evidence of the defendant's treatment of Kyle himself was, on the other hand, properly admitted.

and was therefore too remote to be probative of her intent to harm the infant; secondly, the Commonwealth's offer of proof that the mother's past parental unfitness was an indicator, in any respect, of her intent deliberately to smother her youngest child is unconvincing. Parental negligence in failing to provide adequate physical surroundings and proper nurturing paramount to the welfare of a child may permit the State to terminate parental custody. See *Commonwealth* v. *Ball*, 259 Mass. 148 (1927); *Adoption of Oliver*, 28 Mass. App. Ct. 620 (1990). However, such a determination is not evidence in and of itself tending to show the mother formed a specific intent to kill or actively cause grievous bodily harm to a particular child, the act for which the defendant was indicted. See *Commonwealth* v. *Grey*, 399 Mass. 469, 471 (1987).

We are persuaded by these factors which distinguish the present case from *Gallison, supra*, and are compelled to restate the principle: " '[E]vidence of other offenses is admissible when substantially relevant to the offense charged; inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it, but otherwise inadmissible.' *Bradley* v. *United States*, [433] F.2d 1113, 1119 (D.C. Cir. [1969]), quoting from *Harper* v. *United States*, 239 F.2d 945, 946 (D.C. Cir. [1956])." *Commonwealth* v. *Blow*, 362 Mass. 196, 201 (1972). We conclude that the judge exceeded the limits of his discretion by admitting the evidence under consideration, which lacked the requisite temporal and schematic nexus.

The other cases which the Commonwealth cites in support of its position are also distinguishable. In *Commonwealth* v. *King*, 387 Mass. 464 (1982), evidence that the defendant had oral sex with the victim's younger brother showed a "common pattern or course of conduct toward the two children, and was sufficiently related in time and location to be logically probative." *Id.* at 472. Given the lack of a common pattern linking the defendant's treatment of the two boys as it bore on her intent to injure Kyle, we find *King* inapposite.

Compare *Commonwealth* v. *LeCain*, 19 Mass. App. Ct. 1034 (1985), where records of events that occurred about a year before the murder of a child were held too distant in time and encompassed too many collateral issues to serve as evidence of the accused mother's motive to kill her own child.

Other cases relied on by the Commonwealth are also unconvincing. In *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 76-77 (1978), evidence of "frequent injuries" inflicted by the defendant upon the victim named in the indictment was admissible because it demonstrated that "someone in a custodial relation to [the child] bore him ill will." The holding of *Commonwealth* v. *Drew*, 397 Mass. 65 (1986), may also be distinguished on its facts. There the defendant's past aggressive acts toward the victim and his motive to kill her formed a close parallel.

(b) *Was the error harmless?*

In the event of error in the proceedings "[w]e should set aside the conviction unless we are 'sure that the error did not influence the jury, or had but very slight effect.' " *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980), quoting from *United States* v. *Agurs*, 427 U.S. 97, 112 (1976). We conclude that, once exposed to the challenged evidence, there was a substantial likelihood that the jury's view of the defense was hopelessly skewed. The evidence was largely circumstantial; there were no eyewitnesses available to testify. The father, Kevin Murphy, shifted blame to the defendant in his testimony. He was the only other person in the household at the time of his son's death, and was the only other possible suspect. The defendant's notably poor parental record and her clear frustration with parenthood could not have been lost on the jury. Such "piling of inference upon inference," see, e.g., *Commonwealth* v. *Mandile*, 403 Mass. 93, 94 (1988), especially where there was such a close question as to the cause of death, surely tipped the scales, unfairly we think, in the Commonwealth's favor. The prejudice likely to be generated by the prosecutor, in characterizing the defendant as a "frustrated mother," was very grave. The defendant, in essence, did not have a fair chance to exorcise the specter

which haunted the courtroom throughout the trial — a spec-
ter undoubtedly created by the Commonwealth's witnesses
who repeated described for the jury the squalid conditions in
the defendant's home.

In his charge to the jury, the judge instructed that the evi-
dence of the state of affairs in February, 1988, might be con-
sidered for "a very, very limited purpose. It is admitted
solely as it may assist you in determining [the defendant's]
state of mind or as it may relate to any motive or intent or
hostility that she may have had toward the victim." In our
view, such a cautionary instruction, while commendable,
could not have possibly eliminated the damage inflicted by
this powerfully prejudicial testimony. See *Commonwealth* v.
*DiMarzo*, 364 Mass. 669, 681-682 (1974) (Hennessey, J.,
concurring). See also *Bruton* v. *United States*, 391 U.S. 123,
128-137 (1968). We cannot say the error "did not influence
the jury, or had but slight effect." *Commonwealth* v.
*Seminara*, 20 Mass. App. Ct. 789, 798 (1985). See also
*Commonwealth* v. *Reed*, 397 Mass. 440, 443 & n.4 (1986).
The judgment must be reversed.

2. *The denial of the motion for a required finding of not
guilty.*

The defendant claims that the evidence was insufficient to
warrant a verdict of guilty. She claims, therefore, that the
judge committed error in denying her motion for a required
finding of not guilty.

We have already recited the evidence produced by the
Commonwealth. It was sufficient. After viewing the evidence
in the light most favorable to the prosecution, a rational trier
of fact could have found the essential elements of the crime
beyond a reasonable doubt. *Commonwealth* v. *Ruci*, 409
Mass. 94, 96 (1991), citing *Commonwealth* v. *Latimore*, 378
Mass. 671, 677 (1979). Two well-qualified forensic patholo-
gists gave conflicting opinions as to the cause of death. Any
inconsistencies in the expert witnesses' testimony "go to their
credibility and do not affect the sufficiency of the evidence."
*Commonwealth* v. *Ruci, supra* at 97.

3. *The admission of photographs.* The defendant argues that the admission of photographs of Kyle, taken after his death by an emergency medical technician, were prematurely admitted before the pathologists testified. She argues that the photographs, first submitted to the jury without proper medical background, might have given the jury a false impression that the victim had been beaten and bruised. Admission of photographs in evidence is a matter left to the sound discretion of the trial judge. *Commonwealth* v. *Lawrence*, 404 Mass. 378, 389 (1989). There was no error here. " 'The precise order of admission of the exhibits [photographs] was a matter for the judge'. . . ." *Commonwealth* v. *Florentino*, 381 Mass. 193, 196 (1980), quoting from *Commonwealth* v. *Cadwell*, 374 Mass. 308, 315 (1978).

*Judgment reversed.*
*Verdict set aside.*