## COMMONWEALTH vs. KEVIN T. PODKOWKA.

Hampshire. November 10, 2005. - January 6, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, & SPINA, JJ.

*Homicide. Evidence,* Prior misconduct, Motive, Relevancy and materiality, Exculpatory, State of mind, Intent, Accident. *Malice. Practice, Criminal,* Instructions to jury, Capital case.

At the trial of an indictment for murder in the first degree of the defendant's infant daughter, the judge properly excluded evidence that the defendant sought to introduce through cross-examination of the victim's mother that amounted to nothing more than improper evidence of the mother's bad character [695-697]; further, the defendant was not prevented from presenting his defense that the mother may have committed the crime or that she had the motive, intent, and opportunity to commit it [697-698].

There was no merit to the criminal defendant's claim that the judge at a murder trial erred in admitting in evidence testimony from one Commonwealth expert concerning the infant victim's severe pain and observable health consequences from identified head injuries, when another Commonwealth expert had testified that the brain shearing injury that occurred would have produced almost immediate unconsciousness, where the experts' testimony was not, as the defendant contended, mutually exclusive. [698]

The evidence at the trial of indictments for murder in the first degree by extreme atrocity or cruelty and assault and battery resulting in bodily injury or substantial bodily injury did not warrant a jury instruction on accident [698-700]; further, there was no error in the judge's instruction on extreme atrocity or cruelty or in the prosecutor's reference during closing argument to the nonfatal injuries suffered by the infant victim, where the nonfatal injuries could properly be considered on the question of the defendant's motive, state of mind, intent, and relationship with the infant [700-701].

This court vacated the criminal defendant's conviction of assault and battery on a child causing substantial bodily injury as duplicative of the defendant's conviction of murder, where the assault and battery conviction was based on the same injuries on which the Commonwealth relied for the murder conviction. [701]

INDICTMENTS found and returned in the Superior Court Department on March 29, 2000.

The cases were tried before *Judd J. Carhart,* J.

*Myles D. Jacobson* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for the Commonwealth.

Spina, J. The defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty, two counts of assault and battery on a child under fourteen years (causing substantial bodily injury), and two counts of assault and battery on a child under fourteen years (causing bodily injury). The victim was the defendant's seven week old infant daughter. On appeal the defendant alleges error in (1) the denial of his right to cross-examine the infant's mother regarding her motive for killing the infant; (2) the deprivation of his right to present evidence that the infant's mother had the opportunity and motive to kill the infant; (3) the admission of evidence that the infant's head injury would have caused severe headaches where the infant had become immediately unconscious; (4) the judge's statement to the jury that the evidence did not raise the issue of accidental death; (5) the judge's failure to instruct, at the defendant's request, on the question of accident; and (6) the judge's failure to instruct that extreme atrocity or cruelty could be based only on facts related to the fatal injuries and not on the separately indicted prior, nonfatal injuries. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, and grant a new trial or reduce the verdict. We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E, except that we vacate, as duplicative of the murder conviction, the conviction on the count alleging assault and battery on a child causing substantial bodily injury, to wit: head injuries.

1. *Facts.* The jury could have found the following facts. On September 24, 1999, at approximately 9:18 A.M., seven week old Rhianna Podkowka was transported by ambulance from her home in Easthampton, where she lived with her parents, to Cooley Dickinson Hospital in Northampton, where she was pronounced dead. The defendant, her seventeen year old father, had made a 911 call at 8:56 A.M., requesting emergency assistance for his infant daughter, who was not breathing.

The infant sustained at least five fresh head injuries, including hemorrhaging and a fracture at the top of the skull. The cause of death was diffuse axonal injury, with tearing of axons

in the four separate areas of the brain, referred to as a "brain shearing injury," produced by an acceleration-deceleration mechanism resulting in respiratory difficulty, complicated by an older chest injury consisting of eleven rib fractures. The force needed to cause this brain shearing injury is comparable to that seen in motor vehicle accidents or if an infant were thrown against a wall. It is not seen in household accidents, including those involving an infant falling eight to ten feet. This closed head injury would have rendered the infant unconscious almost immediately. The infant also had other, mostly older injuries: the eleven rib fractures previously mentioned ranged in age from one to six weeks; six leg fractures ranging in age between several days and four weeks; a rare compression fracture of the lumbar spine that occurred at least several hours before death but more likely within one week of death; and facial bruising. The injuries were inflicted, that is, nonaccidental, and they were not consistent with resuscitation efforts, bone disease or disorder, or other natural causes. The brain shearing injury occurred between 5 A.M. and 8:56 A.M. (the time the 911 emergency call for assistance was made) on September 24. During those hours the defendant and the infant's nineteen year old mother were her sole caregivers.

The defendant had been frustrated with his role as the infant's caregiver (the mother worked outside the home), and he took out his frustration on the infant. On September 15, 1999, the infant's pediatrician filed a report with the Department of Social Services pursuant to G. L. c. 119, § 51A, after the defendant explained that bruises on the infant's forehead were caused when she slipped while he was giving her a bath. He also had explained that bruises on her forearm were caused by another child.

The defendant handled the infant roughly in the presence of others. On one occasion he slammed her into her infant seat when she would not stop crying. On another occasion, while babysitting but preferring to be outside having fun, the defendant offered to use his daughter as a football. The infant's mother, with whom the defendant lived, noticed marks on the infant on several occasions after the mother returned home from work. She once saw the defendant bite the infant's cheek hard enough to leave a mark.

While awaiting trial, the defendant admitted to an inmate at the house of correction where he was being held that he resented having to babysit for his daughter and he directed that anger at her. He described instances when he had shaken the infant, slammed her head into a door frame, bitten her on the face, squeezed her chest until she stopped crying, and a time when he rolled her into a ball and then squeezed her "with all his might" until she stopped crying. According to medical testimony, the infant's broken ribs and rare spinal injury were consistent with having been caused by these last two forms of abuse. The defendant also told the inmate that early on the morning the infant died he squeezed her chest as hard as he could, then clasped her back with one hand and slammed her face into the bottom of her crib with all his might. He said that he knew he would not have to check on her later. When he awoke at 8:45 A.M. that morning, he was not surprised by what he found.

The defendant told Trooper Michael C. Barrett of the State police that there were times when, out of frustration, he squeezed the infant and he may have fractured her ribs. Referring to the infant's skull fracture and head trauma, the defendant told the trooper that it was "most likely from [the infant's] hitting [her head] on the door."

2. *Cross-examination of infant's mother.* The primary theory of the defense at trial was that it was not the defendant who had injured and killed the infant, but the infant's mother. There was conflicting testimony about which of the two exclusive caregivers, mother or father, had put the infant to bed at 5 A.M. on September 24, 1999, when the fatal injury most likely occurred. During his cross-examination of the infant's mother, the defendant sought to impeach the impression he perceived she made during direct examination, namely, being a "tearful, crying, caring mother." He attempted to cross-examine her about her alleged abuse of drugs during her pregnancy. He also sought to impeach her testimony that, before the birth of her daughter, she arranged to have her parents be the temporary caregivers of her two year old son from a different relationship so she could move in with the defendant and start a family. He proposed impeachment with evidence that she allegedly did not want to care for her son. The judge precluded these two areas of cross-

examination as improper evidence of bad character. The defendant contends, as he did at trial, that these areas of cross-examination establish a pattern of conduct by the mother designed to separate her from her children, and that they were admissible to show her motive for injuring or killing her daughter. He also argues for the first time on appeal that this evidence was admissible to show bias on the part of the mother.

Generally, a witness cannot be impeached by use of a specific act of misconduct not resulting in a conviction. *Commonwealth* v. *Bregoli,* 431 Mass. 265, 275 (2000). However, prior bad acts of a witness may be admissible to show that she "committed the crime or had the motive, intent, and opportunity to commit it." *Commonwealth* v. *Lawrence,* 404 Mass. 378, 387 (1989), quoting *Commonwealth* v. *Harris,* 395 Mass. 296, 300 (1985). "Normal relevancy considerations apply in determining the admissibility of evidence that someone else committed the crime." *Commonwealth* v. *Conkey,* 443 Mass. 60, 66 (2004).

The defendant acknowledged at trial that the thrust of his cross-examination of the mother was to "get in front of the jury that she made decisions that do go to the fact that she might not have been such a good mother." Poor parenting may provide a basis for the State to intervene in the parent-child relationship, but standing alone, it does not tend to show that a parent had the motive seriously to injure or kill her child. See *Commonwealth* v. *Cokonougher,* 32 Mass. App. Ct. 54, 59 (1992). Here, there was no suggestion that the mother ingested harmful substances during her pregnancy with an intent to harm or abort her fetus. Nor was there any evidence that the mother, by arranging for her parents to take care of her two year old son, intended to harm her son in a way that was relevant to any motive to harm her infant daughter.

The evidence that the defendant sought to introduce through cross-examination of the mother amounted to nothing more than improper evidence of bad character. See *Commonwealth* v. *Weichel,* 403 Mass. 103, 106 (1988). It did not consist of "acts . . . so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Commonwealth* v. *Hunter,* 426 Mass. 715, 716-717 (1998), quoting *Commonwealth*

v. *Keizer*, 377 Mass. 264, 267 (1979). On the issue of motive, it lacked substantial probative value, and would have been unfairly prejudicial and confusing. *Commonwealth* v. *Keizer, supra.* It was too speculative and thus was properly excluded. See *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 401-402, cert. denied, 516 U.S. 861 (1995).

The defendant was permitted to cross-examine the mother as to whether she had told Paul Jenness, a defense witness, that "she wished [she were not] pregnant and didn't want to have the baby," or whether she told Hector Diaz after her daughter was born that she no longer wanted the child. She denied making these statements, and there was no evidence that she purposefully had tried to harm her daughter before or after she was born.

The claim that the circumstances on which cross-examination was denied would have demonstrated bias or prejudice, argued for the first time on appeal, is purely speculative. It would not have been error to exclude the evidence even if the defendant made this claim at trial. In addition, there is no claim that the mother's ability to perceive or recall events had been impaired.

3. *Right to present a defense.* Closely related to the prior argument is the defendant's claim that he was denied the right to present his defense that the mother may have killed their daughter. A defendant has a constitutional right, within certain limitations, to present evidence that someone else committed the crime for which he is being tried. *Commonwealth* v. *Conkey, supra* at 66.

Paul Jenness testified that he had heard the infant's mother say, while she was pregnant, that "she wished she wasn't pregnant and didn't want to have the kid." Jenness was not allowed to testify that the mother made these statements while she was "doing ecstacy and mushrooms and drugs." The defendant argues that had the jury been allowed to hear this evidence, they may have considered the possibility that because her conduct toward her infant during her pregnancy was harmful, she may have been the one to injure the infant after she was born.

The import of the defense, that the mother did not want the infant, was presented through Jenness's testimony about what

the mother had said during the pregnancy. The defendant was not prevented from presenting his defense that the mother may have committed the crime, or that she had the "motive, intent and opportunity to commit it." *Commonwealth* v. *Lawrence, supra* at 387. Absent any evidence that the mother had abused drugs during her pregnancy with the intent to harm or abort the fetus, the proffered evidence concerning the context in which the statement was made was irrelevant to the question of intent or motive. See *Commonwealth* v. *Cokonougher, supra.* There was no error.

4. *Evidence of extreme atrocity or cruelty.* There is no merit to the defendant's claim that it was error to admit testimony from one Commonwealth expert concerning the infant's severe pain and observable health consequences from identified head injuries, when another Commonwealth expert testified that the brain shearing injury would have produced almost immediate unconsciousness. The testimony from these doctors was not, as the defendant contends, mutually exclusive.

The identified head injuries were not from a single impact, as the defendant suggests, but from multiple impacts, and all the head injuries were fresh. Although the sequence of the blows to the head was not known, the jury could have found that because no single blow was sufficient to render the infant unconscious, she experienced severe pain while being subjected to at least the first in a series of brutal injuries and was not rendered unconscious until well into the beatings or shortly after they ended. There was no error.

5. *Accident.* The defendant contends that the judge erroneously invaded the province of the jury by instructing them that the evidence in this case did not raise the issue whether the killing was "excused as a result of an accident, self-defense, or defense of another." The Commonwealth argues that rather than invade the province of the jury, the judge actually refused to instruct on accident because the issue was not fairly raised, and the quote from his instructions is merely a reflection of his prior ruling.

The judge's comment to the jury regarding the absence of accident was not an invasion of their fact-finding function because they never were instructed on the issue of accident. The

defendant had requested an instruction on accident but the judge declined so to instruct because, in his view, there was "no evidence whatsoever that these injuries were caused by an accident."

Accident, like provocation, self-defense, and defense of others, is treated as if it is an affirmative defense, which, when it negates an essential element of a crime (here, malice) must be disproved by the Commonwealth beyond a reasonable doubt. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 203 (1981). When the issue of accident is "fairly raised," the judge, at least on request, must instruct the jury that the Commonwealth must disprove accident beyond a reasonable doubt. See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 145 (1984); *Commonwealth* v. *Lowe*, 391 Mass. 97, 109-110, cert. denied, 469 U.S. 840 (1984); *Commonwealth* v. *Zezima*, 387 Mass. 748, 756 (1982); *Lannon* v. *Commonwealth*, 379 Mass. 786, 790 (1980). Where there is no evidence of accident, the issue is not fairly raised and the judge need not give an accident instruction. *Commonwealth* v. *Palmariello, supra.*

Here, there was no evidence that the infant's fatal head injuries were caused by accidental means. To the extent that the defendant used the term "accident" in his statements to Trooper Barrett, he did not use the term in the sense that he did not intend to kill the infant when he struck the fatal blow (or that the other injuries for which he had been indicted were caused by unintended acts). See *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 648-650 (2002). He used the term essentially as a denial that he had inflicted any blow that caused the fatal injuries (or the other injuries for which he had been indicted). This does not fairly raise the issue of accident so as to require an instruction on accident. See *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 578-579 (1985).

The defendant next contends that the evidence warranted an accident instruction with respect to the indictment alleging assault and battery resulting in bodily injury or substantial bodily injury. Specifically, the defendant argues that there was evidence that the infant's nonfatal injuries were accidental. He cites to three instances in the record. In the first, one witness had seen him try to take the infant out of her baby chair, but her legs got

stuck. "[H]e kind of slammed her back down in it, which caused the chair to bounce." The infant's mother testified about a second instance that the defendant had described when the infant was about ten days old. Apparently he was holding her and his wrist, which was weakened by a cyst, gave out, causing her to fall. He caught her by "smoosh[ing] up against the side." The mother and Trooper Barrett testified about a third incident that the defendant had described. Approximately three weeks before the infant died, the defendant was holding her when the telephone rang. He rushed and turned a corner, bumping her head on the door jamb. The Commonwealth was not relying on these incidents to establish the injuries described in the indictments and in its bill of particulars. Moreover, the incident of the defendant's slamming the infant into the chair, which was witnessed, involved an intentional assault and battery, a general intent crime, see *Commonwealth* v. *Ford*, 424 Mass. 709, 711-712 (1997), for which the defendant is not entitled to an accident instruction. See *Commonwealth* v. *Figueroa*, *supra* at 649-650. There was no error.

6. *Instructions to the jury on extreme atrocity or cruelty.* The defendant argues that the judge erred by failing to instruct the jury that proof of extreme atrocity or cruelty only could be based on facts related to the fatal injuries and could not be based on the prior nonfatal assault and batteries or the suffering from injuries that did not contribute to the infant's death. He contends that the prosecutor encouraged the jury to consider all of the injuries in their determination of extreme atrocity or cruelty, and by failing to instruct the jury that they could not consider the nonfatal assault and batteries, the judge implicitly endorsed the prosecutor's position. There was no objection either to the closing argument or to this portion of the judge's instruction.

When specifically referring to nonfatal injuries at the point in question of her closing argument, the prosecutor expressly acknowledged that they did not cause the infant's death. She suggested, however, that they could be considered on the question of the defendant's anger and frustration with the infant's constant crying, that is, his motive. She also suggested that the nonfatal injuries could be considered on the question of the defendant's

state of mind toward his daughter, that is, on the issue of malice. She then focused on the massive force used to inflict the brain shearing injury between "5:00 A.M. and 8:50 A.M." on September 24, 1999, causing death. This was proper argument. The nonfatal injuries properly could be considered on the question of the defendant's motive, state of mind, intent, and relationship with the infant. See *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 128 (2000). In addition, on reviewing the prosecutor's argument in its entirety, it is apparent that she was arguing that death was caused by the brain shearing injury, and that that should be the basis for returning a verdict of murder committed with extreme atrocity or cruelty.

The judge gave the instruction on extreme atrocity or cruelty appearing in the Model Jury Instructions on Homicide 13 (1999), which expressly "focuses [the jury's attention] on the defendant's action in terms of the manner and means of inflicting death and on the resulting effect on the victim." *Id.* The jury could not reasonably have misunderstood their duty. The judge made it clear that the Commonwealth had to prove that the murder itself was committed with extreme atrocity or cruelty. There was no error.

7. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire case and conclude that relief under G. L. c. 278, § 33E, is not warranted, except in one respect. The conviction of assault and battery on a child causing substantial bodily injury, to wit: head injuries, is based on the same injuries on which the Commonwealth relied for the murder conviction. Therefore, and the Commonwealth agrees, it is duplicative of the murder conviction and must be vacated.

The convictions are hereby affirmed, with the exception that the conviction on count 1 of indictment no. 2000-00030 is vacated.

*So ordered.*