RUBIN, J.
*602 *1227 Defendant Ana Mercedes Franceschi was indicted in Hampden Superior Court on charges of murder in the first degree, G. L. c. 265, § 1 ; armed assault with intent to murder, G. L. c. 265, § 18 (b ) ;
*603 and leaving the scene of property damage, G. L. c. 90, § 24. After a jury trial, she was convicted of the lesser included offense of voluntary manslaughter, G. L. c. 265, § 13, and leaving the scene of property damage, but acquitted of armed assault with intent to murder. The defendant now appeals from her conviction of voluntary manslaughter, arguing that it should be vacated because the Commonwealth failed to present sufficient evidence or that the trial judge's erroneous admission of expert testimony entitles her to a new trial.[1] We affirm.
Sufficiency of the evidence. In evaluating whether a conviction was supported by sufficient evidence, we consider whether the evidence, viewed in the light most favorable to the Commonwealth, could satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. See Commonwealth v. Latimore, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979). Viewing the record evidence in that light, the jury could have found the following.
On the evening of February 17, 2013, the victim and her friend, who testified at trial, drove in the victim's car to Rosario's Mini Market (Rosario's) in Springfield. After entering Rosario's, they talked to several men, including one named Orlando, who was the owner of Rosario's, and one named Rolando, the victim's friend and Orlando's cousin. While the victim was talking with Rolando, the defendant entered Rosario's and began criticizing Orlando, whom she was dating at the time, for talking to the victim and her friend. Although the defendant did not speak to the victim or her friend, the defendant gave them dirty looks and referred to them as "nobodies" and "whores."[2] Orlando and the defendant's argument continued outside the store; then the victim's friend heard a very loud noise that sounded like "glass ... breaking." The victim and her friend left ten or fifteen minutes later, by which point the defendant was gone.
The victim and her friend met up the next morning, along with the victim's fourteen year old daughter, who also testified. The victim told her friend that there was damage to the victim's car on the rear light, the bumper, and the trunk that had not been there the day before. The jury reasonably could have inferred, as the friend did, that the damage to the car was related to the loud noise *604 she heard the night before and that it was caused by the defendant. The friend, the victim, and her daughter then went to Rosario's to talk to Orlando about the car. When they arrived, Orlando was not there, and so they went to a nearby "dollar store." After waiting at the dollar store for a while, they returned to Rosario's to see if Orlando had arrived. On the way back to Rosario's, they needed to cross the street, entering the northbound lane, then crossing the yellow line in the middle of the road into the southbound lane. *1228 When they started to cross, the friend, the victim, and her daughter saw the defendant leaving Rosario's and getting into her motor vehicle. The defendant started driving in the southbound lane, on the right side of the road, towards the three. The friend and the victim's daughter crossed the street safely, but the defendant's vehicle struck the victim while she was still in the road. The victim later died of her wounds.
The accounts of the two percipient witnesses differed somewhat as to how the impact occurred. On direct, the victim's daughter testified that the victim was standing "on the other side" of the road when she was struck.[3] On cross-examination, the victim's daughter stated that the victim was in the "middle of the road." Furthermore, according to the victim's daughter, prior to impact, the victim put her hand up in front of the defendant's vehicle, and the defendant "shook her head and said no." The victim's daughter also testified that the defendant's vehicle sped up before it hit the victim and did not stop after impact.
Like the victim's daughter, the friend testified that the victim was "standing in the middle of the road" when she was struck. However, the friend also testified that she was looking at her keys at the precise moment of impact and turned back only after hearing a loud thud. The defendant sought to impeach the friend's testimony on the location of the impact by introducing a diagram she had drawn for the police shortly after the incident that appeared to depict the victim walking along a snowbank in the southbound lane, and a photograph showing that the snowbank did not approach the middle of the road. The defendant also *605 introduced a prior statement the friend made to police that "[the victim] was walking along, walking past the snowbank."
The friend's trial testimony also differed from the victim's daughter's testimony concerning the defendant's braking. Unlike the daughter, the friend testified on direct that she saw the defendant's brake lights illuminated prior to impact. The Commonwealth then attempted to impeach this testimony with a prior inconsistent statement the friend made to police, in which she claimed that the brake lights were "off" prior to impact. And the friend herself later said on direct, when asked whether "the brake lights came on," that they came on "[w]hen the thud had already happened." The friend's testimony was also unclear as to whether the defendant stopped after hitting the victim but before driving away. The friend stated, "When she hit her, ... she didn't stop. She kept going.... The stop was when she had hit -- when she first hit her and then she continued on." Shortly thereafter, in response to the question, "Did the gray vehicle come to a complete stop?" the friend answered, "No, it continued straight. It left."
According to a detective who later interviewed the defendant, the defendant told him that, after the collision, she drove for a couple of blocks; pulled over; telephoned the police, whom she told to meet her at her house; and went home.
The subsequent investigation revealed that the victim was struck by the defendant's vehicle at its "dead center under the license plate." The investigation also showed various items of debris in a "cone *1229 of evidence." Specifically, an accident reconstruction expert's report showed that blood and hair, a hair tie, a belt piece, a hoop earring, and two more separate units of hair were found in the northbound lane (with some touching the northbound sidewalk); lip balm, two separate motor vehicle parts, and another hoop earring were found in the southbound lane; and a piece of a motor vehicle, blood and hair, more blood, sequins, a belt, and a right shoe were found on the yellow line. The victim's feet were on the yellow line, and her head was in the northbound lane. Furthermore, the investigation showed that the victim had been "overrun" by the defendant's vehicle, indicating a lack of braking immediately following impact. The Commonwealth also introduced expert testimony, discussed in detail infra, that evidence of a "scuff mark" from the victim's shoe showed that the point of impact was in the middle of the road, that is, on the yellow line. *606 The defendant's only sufficiency argument is that the Commonwealth bore but failed to satisfy the burden of disproving accident beyond a reasonable doubt. Accident is an affirmative defense that the Commonwealth must disprove beyond a reasonable doubt when the issue is "fairly raised." Commonwealth v. Podkowka, 445 Mass. 692, 699, 840 N.E.2d 476 (2006), quoting Commonwealth v. Palmariello, 392 Mass. 126, 145, 466 N.E.2d 805 (1984). We agree with the defendant that the issue of accident was fairly raised, but disagree that the evidence, viewed in the light most favorable to the Commonwealth, is insufficient to disprove it beyond a reasonable doubt.
According to the defendant, the evidence is insufficient to disprove accident because the Commonwealth did not show that she had an opportunity to stop. Whether or not the defendant could have stopped, as our recitation of the facts shows, there was plenty of evidence in the record from which a rational juror could have concluded that the homicide was intentional, and hence not accidental. See Commonwealth v. Dyer, 460 Mass. 728, 751 n.31, 955 N.E.2d 271 (2011) (accident is "an unexpected happening that occurs without intention or design on the part of the defendant"). See also Commonwealth v. Matos, 394 Mass. 563, 566, 476 N.E.2d 608 (1985) (flight can constitute evidence of consciousness of guilt); Commonwealth v. Carlson, 448 Mass. 501, 509, 862 N.E.2d 363 (2007) (motive evidence may be relevant to issue of intent). While the percipient witnesses' versions of events were not fully consistent, they agreed on several of the fundamental points, and much of their testimony lined up with the forensic evidence gathered from the scene. In addition, the jury were free to believe the victim's daughter, according to whom the defendant sped up before impact, "shook her head no," did not brake before impact, and drove away without stopping, all of which could support a finding of the requisite intent. We therefore conclude that the voluntary manslaughter conviction was supported by sufficient evidence.
Expert testimony on scuff marks. At trial, the Commonwealth introduced the accident reconstruction expert testimony of retired police Officer Edward Laviolette, Jr. Laviolette testified that a particular mark left in the middle of the road -- on the yellow line -- was a "scuff mark" from the victim's shoe (also known as a "shoe scuff"), and opined that because it was a shoe scuff, it represented the approximate point of impact between the victim and the defendant's vehicle. The defendant filed a motion in limine to exclude this portion of Laviolette's proposed testimony, *607 which the judge denied after a hearing pursuant to Commonwealth v. Lanigan, 419 Mass. 15, 25-27, 641 N.E.2d 1342 (1994). The defendant objected to the testimony again at trial, preserving the issue *1230 for appeal.[4] We therefore review for prejudicial error. See Commonwealth v. Haggett, 79 Mass. App. Ct. 167, 171, 944 N.E.2d 601 (2011). Because a judge's decision to admit expert testimony is within his or her discretion, we may find the judge's decision in error only if the judge abused that discretion. See Commonwealth v. Shanley, 455 Mass. 752, 762, 919 N.E.2d 1254 (2010).
The Commonwealth must establish the following five foundational requirements to admit expert testimony in a criminal case:
"(1) that the expert testimony will assist the trier of fact ...; (2) that the witness is qualified as an expert in the relevant area of inquiry ...; (3) that the expert's opinion is based on facts or data of a type reasonably relied on by experts to form opinions in the relevant field ...; (4) that the process or theory underlying the opinion is reliable ...; and (5) that the process or theory is applied to the particular facts of the case in a reliable manner."
Commonwealth v. Barbosa, 457 Mass. 773, 783, 933 N.E.2d 93 (2010).
There can be no doubt that Laviolette is qualified as an accident reconstruction expert. The issue here is whether, in determining that the mark was a scuff mark, he utilized a "reliable ... method[,] ... reliably applied." Commonwealth v. Weaver, 474 Mass. 787, 810, 54 N.E.3d 495 (2016). The defendant argues that Laviolette's opinions that the mark on the road was a shoe scuff, and that it was created by the victim's shoe, "rested on no methodology, much less a reliable one."
Laviolette testified at the Lanigan hearing that he examined the mark in the road and concluded, based on his training and experience, that the mark "look[ed] like a shoe scuff." He testified that, having reached that conclusion, he then checked to see if it lined up with the path of the evidence and was consistent with information about the crash that he learned from percipient witnesses. He testified that identifying such scuff marks was part of his "formalized training ... specifically the pedestrian/bicycle *608 crash investigation." But he could not describe what properties of the mark established that it came from a shoe in general or the victim's shoe in particular. On direct examination at the hearing, he testified only as to how, in general, he could determine whether a given mark was a shoe scuff: "They're pretty identifiable, roughly the size of a shoe, sometimes directional. Again, it's like a bicycle tire, it's pretty clear -- leaves a clear mark. Something I've seen many times before and it's easily identifiable." The prosecutor did not ask him what about this particular mark led him to conclude that it was a shoe scuff, but only whether Laviolette was able to "determine that this was in fact a shoe scuff," which he claimed he was.
Even before cross-examination at the hearing, the judge himself asked of Laviolette, "Is there a body of scientific evidence that you have studied regarding interpretation of scuff marks off the road?" Laviolette said, "I think it's like any piece of evidence. It's something that they do ask you to look for. It's discussed among the accident reconstruction community."[5]
*1231 Laviolette's testimony on cross-examination was no more enlightening:
ATTORNEY : "Is there anything specific that you can point to about your training and experience that would lead you to conclude that a black high-top sneaker would leave that particular mark in the road?"[6]
WITNESS : "Yes."
ATTORNEY : "What is it?"
WITNESS : "Again, I look for -- one of the first things I look for in a pedestrian accident is a foot strike, foot scuff."
He did not describe what characteristics led him to conclude that the mark was a shoe scuff or cite any material that distinguished the shoe scuffs from other marks in the road. Although Laviolette repeatedly testified that the mark came from a shoe, he *609 could give no explanation for why it might not have come from another object. Indeed, cross-examination at the hearing included this colloquy:
ATTORNEY : "Is there any reason why this scratch mark couldn't have come from a snowplow?"
WITNESS : "From a snowplow? I have no idea."
When asked later on cross-examination what "scientifically acceptable way" enabled him to tell whether the mark was left during the incident, he responded, "Again, it comes from my training and experience of seeing these marks, and that's a mark that, like I said, that's something I've seen before." The final colloquy on cross-examination included the following:
ATTORNEY : "Well, again, going back to this mark that you're saying there, what about that tells you that it was a shoe? And again, based on your -- based on scientific training, the training that is given to accident reconstruction experts, is there anything unique about that mark that says it comes from a shoe and not something totally different? ... I will make it simple. How is that a shoe mark?"
WITNESS : "I believe it is."
Laviolette testified that he was not aware of any studies related to the identification of shoe scuffs. The cross-examination at the hearing concluded:
ATTORNEY : "Okay. That you're aware of and that you utilized in this case, did you use any particular studies or research as to shoe marks in the road?"
WITNESS : "Just training and experience. Experience mainly."[7]
We agree with the defendant that Laviolette did not articulate a methodology that is sufficiently reliable to satisfy the Lanigan *610 standard. His testimony that it looked to him like a shoe scuff simply states his conclusion. While training and experience, to which Laviolette referred, *1232 might have taught him a methodology, it is not itself a methodology. Asserting one is trained, without explaining the methodology in which one was trained, is not enough. If it were, there would be no reason for Lanigan and its progeny to require judges to evaluate both an expert's qualifications and his or her methodology -- qualifications would be sufficient. In the absence of any explanation of how he identifies the mark as a shoe scuff, Laviolette's circular statement that he has seen such marks before at accident scenes, with its implication that this one looked like the others, is not an explanation of methodology. The statement does nothing to explain what it is about the mark that leads him to believe it is a scuff mark rather than something else. (And indeed, he testified that he did not know why his methodology excluded the possibility that the mark was actually left by a snow plow). Although Laviolette mentioned tracing the evidence path and considering the observations of percipient witnesses, he did not testify that these factors were what allowed him to identify the particular mark as a shoe scuff; the Commonwealth characterizes this testimony as saying they were "confirm[atory]." Nor could he have concluded it was a shoe scuff on the basis that there must have been one somewhere: Laviolette testified that he did not always find shoe scuffs in pedestrian accidents.
The evidence at the hearing was thus insufficient under Lanigan to support a determination that Laviolette reliably applied a reliable method in determining that the mark on the road was a shoe scuff. The judge therefore erred in allowing Laviolette's testimony on shoe scuffs.[8]
An error is nonprejudicial only if it "did not influence the jury, or had but very slight effect." Commonwealth v. Flebotte, 417 Mass. 348, 353, 630 N.E.2d 265 (1994). Having examined the transcript, the *611 evidence before the jury, and the closing arguments, we conclude that there was no prejudice here.
In closing, defense counsel argued only that the shoe scuff testimony might have created a mistaken impression of the distance that the victim was dragged under the defendant's vehicle. He argued that the actual point of impact was at cone 3, which was in the northbound lane -- even farther out of the southbound travel lane than what Laviolette identified as the scuff mark. Although the prosecutor referred to it in closing as the point of impact, he argued that, even under the defendant's theory, it was irrelevant whether it did or did not indicate that point. The location of the blood from cone 3 equally well supported the conclusion that the incident was intentional. Beyond this, the purported scuff mark, the nature of which was vigorously contested at trial through the defendant's own expert, was somewhat of a sideshow, with the critical question being whether the defendant attempted to stop. Given this, we are confident that the erroneous admission of Laviolette's expert testimony *1233 did not prejudice the defendant.[9] ,[10]
Judgments affirmed.

She does not appeal her conviction of leaving the scene of property damage.

It is unclear whether the defendant used both words to describe the victim and her friend. The friend's testimony was given through a Spanish interpreter, and the friend used two different Spanish words to describe what the defendant called them. After the friend's testimony, it came to light that the Spanish word the translator translated as "nobodies" also could have been translated as "tramp" or "slut," so it is possible that the defendant did not refer to them as "nobodies." The friend was not recalled.

It is not clear from the transcript what "on the other side" means. The victim's daughter, through an interpreter, said that this meant "[w]here the cars are coming down." Because the victim's daughter had already crossed, it is likely that she meant that the victim was struck in the northbound lane. The testimony would have been clearer to the jury because the victim's daughter was using a demonstrative aid.

The trial was held before the Supreme Judicial Court decision in Commonwealth v. Grady, 474 Mass. 715, 719, 54 N.E.3d 22 (2016), which would have made a subsequent objection at trial unnecessary to preserve the issue for appeal. The Commonwealth argued in its brief that the defendant failed to preserve the issue, but conceded at oral argument that she did.

Lanigan also permits the use of methods "generally accepted in the scientific community." 419 Mass. at 20, 641 N.E.2d 1342. Laviolette did not assert that he used any such method -- he said only that scuff marks are "discussed among" the accident reconstructionist community -- and, in any event, because, as we conclude infra, he described no method at all, the evidence could not have been admitted under this alternative prong of Lanigan.

Laviolette testified that the victim was wearing this type of sneaker.

After cross-examining Laviolette at the hearing, the defendant called a counterexpert, Richard Montefusco. Montefusco testified that the marks on the road were "scratch marks" that likely came from a snow plow, and that there was no way to determine when they were left in the road. Shoe scuffs, according to Montefusco, generally leave rubber marks, not "clear, distinct scratches" like the ones found in the road at issue here. He also testified that, to determine whether a mark on the road was caused by a particular shoe, an expert would "have to match the mark on the shoe to the mark on the road," including the "geometry of the scratch." Laviolette had testified at the hearing that he had examined the shoe, but did not testify that he had compared it to the marks in the road.

The Commonwealth points out that, as the Supreme Judicial Court held in Canavan's Case, 432 Mass. 304, 313, 733 N.E.2d 1042 (2000), "personal observation[ ]" can sometimes be a sufficiently reliable methodology. But Canavan's Case also held that "personal observations are not excepted from Lanigan analysis." Id. This means that the proponent of the testimony must establish the reliability of the personal observation, which the Commonwealth failed to do here. We do not hold that there exists no reliable methodology, even one based solely on personal observation, to identify a mark in the road as a shoe scuff. We hold only that there was no evidence that Laviolette followed such a methodology in this case.

Our conclusion here also disposes of the defendant's claim that Laviolette's testimony at trial that he believed the mark was a shoe scuff because a pedestrian's shoe would heat up, accelerate, and disturb the dirt on the yellow line constituted unfair surprise. Assuming without deciding that it did, any error was nonprejudicial.

The defendant also challenges the methodology behind Laviolette's conclusion that the absence of skid marks demonstrated a failure of the defendant to brake during the collision. At the Lanigan hearing, Laviolette testified that, if the defendant, whose vehicle had an antilock brake system (ABS), had been braking during the collision there would be "pulsating skid marks" on the road, that that is "exactly what you're going to see." Given the overrun of the victim and the absence of any such marks, he concluded that the defendant had not used her brakes. Montefusco stated at the hearing that there might be a "shadow mark," "a very, very light, faint tire mark," that can "sometimes" be left by "hard pedaling."
Defense counsel argued that Laviolette's conclusion was not scientifically valid; "they want to say [that] ... the fact that there was no evidence of skid marks or sort of anything like that means that she didn't attempt to brake, ... [but] just because there's no skid marks didn't mean she didn't attempt to brake. She may have attempted to brake. We don't know." Counsel argued that the jury should not hear an opinion based on the absence of skid marks "that there was no braking, period."
We may assume without deciding that the defendant is correct that the evidence at the hearing was insufficient under Lanigan to support a determination that Laviolette reliably applied a reliable method in determining that braking would have caused the pulsating skid marks he described. At trial, however, Laviolette did not testify that skid marks would always be left by a braking vehicle with ABS. On direct examination, after explaining skid marks, he testified that he saw no evidence of braking. On cross-examination, he agreed that "you can't say in every single case that ABS is used that there will always be skid marks," and testified that "[i]t is possible" that if someone applied the brakes, the vehicle could have slowed and left no skid marks. In these circumstances, any error at the Lanigan hearing would not have been prejudicial.